PATE, Plaintiff in error, v. STATE, Defendant in error.

*No. State 103. Submitted under sec. (Rule) 251.54 October 3, 1973.*
*—Decided October 30, 1973.*
(Also reported in 211 N. W. 2d 495.)

For the plaintiff in error the cause was submitted on the brief of *Philip L. Atinsky* and *Atinsky, Kahn & Sicula* of Milwaukee.

For the defendant in error the cause was submitted on the brief of *Robert W. Warren,* attorney general, and *Michael R. Klos,* assistant attorney general.

CONNOR T. HANSEN, J.   We find no error in the trial of this case.   Also, we have considered the detailed findings of fact and conclusions of law entered by the trial judge after an extensive hearing on the defendant's motion for a new trial.   However, after examination of the record of the preliminary examination, the trial and hearings on the post-trial motions, we reach the conclusion that it is probable that justice has miscarried in this case and, therefore, we are of the opinion that this is an appropriate case in which to grant a discretionary reversal pursuant to the provisions of sec. 251.09, Stats.

We, therefore, set forth the facts in considerable detail.

### *Facts.*

November 14, 1968, two men entered a service station in Milwaukee.   One of the men asked Gene A. Juergens, an employee, for change for a $10 bill.   As Juergens was opening the cash register, the man put a gun in his ribs, ordered him to lie on the floor and then emptied the register.   Juergens later identified this man as the defendant.

John A. Petcoff, the operator of the station, was in another room.   The second man involved was partially masked.   He hit Petcoff on the back of the head, threatened him and ordered him to open the safe.   After the safe was open, he ordered Petcoff to empty his pockets, then lie on the floor and be quiet.   Petcoff was in a dazed condition and could not identify either the masked or unmasked robber.

While Petcoff and Juergens were on the floor and the safe was being emptied, George Bond, an out-of-state motorist, stopped to get directions. When Bond walked into the station he asked the unmasked man for directions, whereupon the man pulled a gun from his coat. Bond then noticed Juergens on the floor and realized he had walked in on a robbery. The unmasked man put a gun to Bond's stomach, turned him around, took his money and ordered him to lie on the floor with Petcoff. The two men left and the incident was reported to the police.

Several days after the robbery Detective Perlewitz, of the Milwaukee police department, brought eight to 10 photographs of different individuals to Juergens for examination. Juergens viewed the photographs for ten or fifteen minutes and selected the photograph of the defendant as one of the men who committed the robbery.

A warrant was issued for the defendant's arrest and he was subsequently arrested when leaving his home. At the time of his arrest, he had a .22-caliber pistol in his pocket. At the trial, this was admitted into evidence. Defendant testified it belonged to his wife, and explained that the nature of his work required him to be out of the city a considerable amount of time; that there had been robberies and break-ins in their neighborhood; and that his wife had purchased the gun for her own protection. The morning of the arrest, the defendant and his wife had an argument, he saw the gun in the closet where his coat hung, and as he left the house he put it in his pocket. Also at the trial, Bond admitted he knew little about guns, but testified that this gun was similar to the one used in the robbery. However, Juergens testified he was sure the .22 pistol was not the gun used in the robbery. He was certain that gun was a larger caliber, similar to a .38-caliber pistol with a silencer on it, and of a different color.

Bond did not testify at the preliminary examination, but at the trial he identified the defendant as the unmasked robber. However, at the preliminary examination, Juergens was seated outside the magistrate's courtroom when he was told by a police officer that some suspects were going to be brought out. The defendant and another man several inches shorter were brought by and Juergens identified the defendant as one of the robbers. This incident was discovered by defense counsel midway through the trial on cross-examination.

One of the crucial issues in our determination to grant a discretionary reversal relates to both the circumstances and the testimony at the trial and post-trial motions as to the whereabouts of the defendant on the morning of the crime.

No notice of alibi was filed. After the state had rested and a conference held in chambers, the defendant was permitted to testify that he was innocent and not at the scene of the crime at the time of its perpetration, but he was not permitted to explain his whereabouts. We think the trial court construed the notice of alibi statute (sec. 955.07, Stats. 1967) favorable to the defendant. *See: State ex rel. Simos v. Burke* (1968), 41 Wis. 2d 129, 163 N. W. 2d 177.

The jury returned a verdict of guilty. In effect, this meant they believed the testimony of Juergens and Bond as to identification and disbelieved the testimony of the defendant. Such a determination was entirely within the prerogative of the jury. Immediately after the trial, Jack Gimbel, defendant's trial counsel, informed the trial court that he had information which the defendant had prohibited him from disclosing, and that there had been a gross miscarriage of justice in convicting the defendant. This information included statements by the defendant to Gimbel that he had not committed this crime; and that he knew the persons who had but was afraid that if he,

the defendant, disclosed their names, his five children would be in danger. The defendant believed he would be found innocent without making such a disclosure.

A presentence investigation was requested in light of the defendant's work record, community activities and the fact that he had no criminal or juvenile record, except a nonsupport charge arising out of an incident before his marriage. He had been married ten years. This request was denied, and sentence was pronounced.

### Identification.

The pretrial identification at the preliminary examination, by which Juergens, the service station attendant, again identified the defendant, was, as conceded by the state, constitutionally impermissible. Gimbel did not discover this improper identification until he began cross-examining Juergens. However, after having discovered this improper procedure, defense counsel made no motion to strike Juergen's testimony. Therefore, any objection was waived. Moreover, it should be noted that the mere fact that this identification procedure was suggestive does not, per se, render the identification in court unreliable. In *Neil v. Biggers* (1972), 409 U. S. 188, 199, 93 Sup. Ct. 375, 34 L. Ed. 2d 401, the United States Supreme Court said:

"We turn, then, to the central question, whether under the 'totality of the circumstances' the identification was reliable even though the confrontation procedure was suggestive. As indicated by our cases, the factors to be considered in evaluating the likelihood of misidentification include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation. . . ."

Juergens testified he observed the defendant at the service station; he described him to the police; and he identified the defendant out of eight or 10 photographs exhibited to him several days after the incident. His identification of the defendant was independent of the incident that occurred immediately prior to the preliminary examination. We find no reversible error arising out of this identification.

### *Alibi.*

A reading of the entire record shows that the defendant's trial attorney did not file a notice of alibi as a result of deliberate trial strategy. Gimbel explained his position to the trial court:

"*Mr. Gimbel:* Your Honor, I am not going to ask him if he were somewhere else. An alibi is to put the state on notice that he was someplace else—we are not asking if he was somewhere else. We did not file an alibi that he was with someone else or any other place. He has no memory of that date, except he knows he was not on the premises. I don't believe, under those cases cited by Mr. Hodan, that I would be prohibited from putting the defendant on the stand to testify that he did not commit the crime and that he was not on the premises at that particular time.

"*The Court:* I think you pointed that same position out in our conference—not with the detail you have now —but, to the effect that you weren't going to attempt to prove he was someplace else, specifically.

"*Mr. Gimbel:* That's right."

At the subsequent postconviction motion, the trial court found that the defendant told his attorney that he knew he was not at the scene of the crime because he had been jogging every morning the week of the robbery in preparation for a prize fight, and that he had no one to substantiate this claim because he ran alone. In addi-

tion, the trial court further found that the defendant at no point before or during the trial informed his attorney of any alibi witnesses or anything else which might have substantiated his claim that he was not at the scene of the crime.

In Gimbel's view there was no effective alibi since there was no persuasive evidence to substantiate the claim other than the defendant's assertion that he was jogging along the lakefront every morning of the week of the robbery. Accordingly, Gimbel decided not to file a notice of alibi, but instead, sought to present this limited testimony to the court in the course of his direct examination of the defendant who intended to testify that he did not commit the robbery. This was a reasonable and competent trial tactic. As this court stated in *State v. McDonald* (1971), 50 Wis. 2d 534, 539, 184 N. W. 2d 886:

". . . While the defendant should be consulted concerning pleas of guilty and the general defense of his case, he need not be consulted in every detail. The accused has no more right to control his attorney and the conduct of the trial than he has to dictate to his surgeon how to perform the operation."

Also, because of our decision to grant a discretionary reversal, we do not reach the question of the constitutionality of the notice of alibi statute (sec. 955.07, Stats. 1967). *See: Wardius v. Oregon* (1973), 412 U. S. 470, 93 Sup. Ct. 2208, 37 L. Ed. 2d 82.

*Discretionary reversal.*

At the hearing on the postconviction motion, the defendant called several witnesses to testify regarding his whereabouts at the time of the crime. He also had his trial counsel, Jack Gimbel, testify that he had learned after the trial that Leroy Whitlow and Ray Walker had robbed this service station and Caeser Stinson, who was

a former client of Gimbel's, had aided in the crime by driving the car. The defendant's grandmother also testified that Stinson had told her after the trial that her grandson was innocent and that he knew who had actually committed the crime. The lower court held that this evidence, if true, was known to the defendant prior to the trial and therefor did not constitute "new evidence." The motions to set aside the verdict and for a new trial were denied.

After the hearing on the postconviction motion, the trial court made findings of fact, some of which are not completely supported by the record. The court found that the defendant never advised his trial counsel before or during the trial that other persons had committed the crime or were parties to it. However, the court also found that trial counsel advised the defendant before trial and in the presence of defendant's wife and grandmother that the defendant was taking a tremendous gamble if he did not testify as to the names of the individuals who had committed the crime, but that the defendant prohibited his trial counsel from using any of that testimony because he was in fear of what would happen to his five children. This latter finding has substantial support in the trial record and in the record of the hearing on the postconviction motion.

There is no question that the jury was correct in finding the defendant guilty on the basis of the testimony presented. While the defendant's prohibiting his trial counsel from disclosing the names of the true criminals in this case can hardly be condoned, it can be explained by his apparent concern for his wife of ten years and his five children.

Attorney Gimbel, whose credibility the trial court unqualifiedly accepted, testified at the postconviction motion hearing that after the trial the defendant had given him

the names of the robbers, Ray Walker and Leroy Whitlow. Gimbel also testified that a former client of his, Caeser Stinson, had received part of the proceeds of this robbery. Moreover, Stinson paid part of the defendant's legal fees because they were very good friends. Gimbel also testified that Stinson had told him that Whitlow and Walker had robbed the service station and not the defendant. Gimbel was negotiating to get immunity for Stinson when Attorney Alan D. Eisenberg was retained to bring postconviction motions for the defendant. Nonetheless, Stinson apparently gave written statements to the police without receiving immunity. Gimbel also testified that, based upon photographs which he had apparently obtained from the bureau of identification, there was a resemblance between Ray Walker and the defendant.

Lola Kilgore, defendant's grandmother, testified that on July 22, 1970, after the trial, Caeser Stinson had come to her beer depot and told her that he knew the defendant was not guilty. Stinson told her that he had driven Whitlow and Walker to the service station but had no idea they were going to rob it. Stinson said he picked them up after he saw them running from the station. Kilgore also testified that she immediately reported what Stinson had told her to Alan D. Eisenberg and signed an affidavit to that effect. She also went to see Mr. Hodan, the assistant district attorney who handled the case, and told him what Stinson had said at her beer depot.

The defendant was a professional fighter, ranked 39th in the world in his weight division. He testified that Caeser Stinson had called him early on the morning of the crime to discuss his upcoming fight and had also told him they were going to rob some place. After he had finished training that morning and had breakfast, he received a call from Whitlow who told him to come

to Stinson's house. He went to Stinson's house and when he arrived he saw Stinson, Whitlow and Walker counting the money from the robbery. Whitlow was going to repay the defendant some money he owed him but he refused to do so when it was determined that they had not received as much as they had anticipated from the robbery.

At the time of the crime, the defendant was training for a fight in New Orleans which was to have been held in December. Myles Jackson, his trainer, testified that they had been doing road work every morning in preparation for this fight. Every day after road work they had breakfast at George Webb's restaurant. Jackson testified, as did the defendant, that they finished their road work and arrived for breakfast at approximately 9 a. m. He said they remained at the restaurant until about 10:30 a. m. that morning. Shirley Henderson, one of the two waitresses at George Webb's that morning, also testified that she remembered the defendant and Jackson being in the restaurant on the morning of the crime between the hours of 9 and 10. She remembered them because they had been regular customers every morning for one or two months and she knew the defendant was training for a fight. The other waitress, Doris Tatum, was sick the day of the hearing and did not testify.

After the defendant's grandmother, his wife, and Gimbel had discussed the situation with the assistant district attorney after trial, the assistant district attorney and several police officers went to the reformatory to interview the defendant. In rebuttal, Officer Wiesmueller testified that when he spoke with the defendant at the Green Bay reformatory on November 5, 1969, he never mentioned that he was with Myles Jackson but said he was running "alone." However, his written report of this meeting did not mention that the defendant had specifically stated he was running "alone."

The defendant's grandmother, Lola Kilgore, was described in the trial court's findings of fact after the hearing on the post-trial motions as "patently incompetent" without further explanation. Gimbel's testimony remains unexplained, as does the testimony of Myles Jackson, his trainer. Similarly, the testimony of the waitress at George Webb's restaurant, who must be considered an uninterested party, remains unexplained. The testimony of Jack Gimbel, Lola Kilgore, Myles Jackson and Shirley Henderson, is all in substantial accord.

The testimony at the hearing on post-trial motions also revealed the following facts. At the time of the crime, the defendant had been working for Schlitz Brewery and earning $650 per month. He was also receiving $550 per month as expense money from his manager because he was preparing for a fight. He owned his own home. He had very outstanding promise as a professional fighter. He had neither a criminal nor a juvenile record except for nonsupport as a result of an illegitimate child he had fathered as a teenager before entering military service. He served in the Army as a paratrooper for more than three years and was honorably discharged. He was active in the community as a coach with the Milwaukee Recreational Department and the Milwaukee Boys Club. He was assistant director of the YMCA Social Development Commission program in 1967. He worked with the Inner City Development office helping high school dropouts and unemployed persons. He also assisted in obtaining federal funds for a gymnasium to be used by blacks in the inner core.

Sec. 251.09, Stats., provides that in an action or proceeding brought to this court by appeal or writ of error, this court ". . . may in its discretion . . ." reverse the judgment or order appealed from if it shall appear from the record ". . . that it is probable that justice has for any reason miscarried . . . ." In criminal cases, this court has stated that such grave doubt must exist regard-

ing the defendant's guilt to induce the belief that justice has miscarried or that we would at least have to be convinced that the defendant should not have been found guilty and that justice demands the defendant be given another trial.[1] We believe this to be such a case and, therefore, the judgment and order are reversed, and the cause remanded for a new trial.

*By the Court.*—Judgment and order reversed, and cause remanded for a new trial.

---

[1] *Commodore v. State* (1967), 33 Wis. 2d 373, 383, 147 N. W. 2d 283; *Collings v. Phillips* (1972), 54 Wis. 2d 204, 211, 212, 194 N. W. 2d 677.