FELLS, Plaintiff in error, v. STATE, Defendant in error.

*No. State 82. Submitted under sec. (Rule) 251.54 October 3, 1974.—Decided November 26, 1974.*
(Also reported in 223 N. W. 2d 507.)

526

The cause was submitted for the plaintiff in error on the briefs of *Milton S. Padway* of Milwaukee, and for the defendant in error on the brief of *Robert W. Warren,* attorney general, and *Christine M. Wiseman,* assistant attorney general.

WILKIE, C. J.    The court is asked to review the August, 1972, judgment of conviction following a jury trial of Ralph T. Fells, the defendant-plaintiff in error here, for attempted first-degree murder in violation of secs. 940.01 and 939.32, Stats., and for attempted armed robbery in violation of secs. 943.32 (1) (a) and (2) and 939.32. He

was sentenced to a prison term of not more than twenty years for the attempted murder and to a concurrent term of not more than ten years for the attempted robbery. The trial court denied motions after verdict and also the postconviction motion filed under sec. 974.06 on the basis of alleged newly discovered evidence. Our review is directed not only to the judgment of conviction but to the trial court's denial of the post-trial motions.

Several issues are presented:

Did the state prove that Fells was the assailant?

Did the state prove that the assailant had an intent to kill?

Did the trial court properly admit evidence of the line-up identification of Fells?

Our answer to all three questions is "Yes."

A further issue is presented as to whether Fells demonstrated, pursuant to his sec. 974.06 motion, that Officer Puhlmann committed perjury that prejudiced Fells' right to a fair trial. We think he did not.

The incident underlying these convictions occurred in the city of Milwaukee on December 20, 1971, at approximately 6:45 p.m. The victim, Marilyn Knowlton, testified that she departed from a city bus on her way home from work. After walking about a block down Hampton Avenue toward her residence she was accosted by a man behind her and to her right who demanded, "Hand over your money." She replied "No." When the man stepped in front of her she noticed he was carrying a small handgun in his right hand pointed "Towards the middle part of my body." As the man stood within a foot of her, he continued asking for her money or her purse, and Mrs. Knowlton continued to refuse. He then reached for the purse with his left hand. She pulled back and yelled as loudly as she could "Where are the police when you need them?" He then struck her on the back of her head with the butt of the gun. She hit him once on the right arm.

Following this blow he struck Mrs. Knowlton's forehead with the gun, knocking her glasses to the ground. Still standing within a foot of her, the assailant then fired the pistol directly into her abdomen and ran away. He did not succeed in taking her money or her purse. Holding her side, Mrs. Knowlton walked down Hampton Avenue toward her home when she was stopped by a passing motorist, James Spanos, who took her to the hospital. She remained in the hospital for nine days, where a bullet was removed from her liver.

The entire incident lasted about two minutes, and Mrs. Knowlton was able to observe the man at close range for about one minute, forty seconds, before her glasses were knocked off. She identified Fells as her assailant on several different occasions and this identification is a major source of Fells' attack here on his conviction.

1. *Did the state prove that Fells was the assailant?*

We conclude that the evidence was sufficient here to identify Fells as Mrs. Knowlton's assailant.

We test the sufficiency of the evidence leading to the conviction by the oft-stated rules as follows: This court must affirm if it finds that the jury, acting reasonably, could have found guilt beyond a reasonable doubt.[1] The function of weighing the credibility of witnesses is exclusively in the jury's province,[2] and the jury verdict will be overturned only if, viewing the evidence most favorably to the state and the conviction, it is inherently or patently incredible, or so lacking in probative value that no jury could have found guilt beyond a reasonable doubt.[3]

---

[1] *Whitmore v. State* (1973), 56 Wis. 2d 706, 713, 203 N. W. 2d 56; *Bautista v. State* (1971), 53 Wis. 2d 218, 223, 191 N. W. 2d 725; *State v. Clarke* (1967), 36 Wis. 2d 263, 272, 153 N. W. 2d 61.

[2] *Baldwin v. State* (1973), 59 Wis. 2d 116, 119, 207 N. W. 2d 630.

[3] *Id.; Lock v. State* (1966), 31 Wis. 2d 110, 114, 115, 142 N. W. 2d 183.

Mrs. Knowlton actually identified Fells as her assailant on several different occasions:

(1) On December 25, 1971, five days after the attack, while in the hospital she picked Fells' pictures out of seven photographs shown to her by Detective Toepfer of the Milwaukee police department. Two of these pictures were of Fells—one a side view and one a front view. Both showed his head and collar only. Height bars on the wall behind showed Fells to be 5' 11½" in one picture, and 6' 1" in the other. Mrs. Knowlton recognized Fells in both pictures.

(2) More than three weeks later, during a lineup on January 18, 1972, where Fells was represented by an attorney, Mrs. Knowlton again identified Fells as her assailant. Immediately prior to the trial, following a *Wade* hearing, the trial court ruled that neither the photographic nor the lineup identifications were in any manner constitutionally improper.

(3) Finally, during both the preliminary hearing and the trial, Mrs. Knowlton personally identified Fells as her attacker.

At the preliminary hearing, Mrs. Knowlton testified that shortly after the attack she told police that the assailant was in his late twenties, was about 6' tall, weighed about 160, and did not have a mustache and had somewhat wavy, a little curly, hair. She further stated that he had dark trousers and a knee-lenth leather overcoat, dark tan with black "kind of intermingled." At trial, however, she testified that her attacker had a mustache, although she said it was "a very thin mustache, not very noticeable." A close-up picture of Fells taken on December 24, 1971, four days after the incident, shows he had a very thin mustache on his upper lip. Fells admitted that he wore that kind of mustache from the time he was discharged from the army in April of 1970 until about December 29, 1971, when he shaved it off. Mrs.

Knowlton also testified her assailant's hair was "somewhat kinky, and short." Finally, at trial she described her assailant's overcoat as dark brown with "very noticeable" black "panther stripes."

Fells now contends that Mrs. Knowlton gave incompetent testimony at the preliminary hearing where she said her attacker had no mustache and had somewhat wavy or curly hair, while at the trial she testified that her assailant had a very thin mustache and that her assailant's hair was somewhat kinky and short.

These inconsistencies are not so serious that they render Mrs. Knowlton's testimony patently incredible. Any discrepancies are only slight. The pictures of Fells, taken four days after the incident, reveal a very thin, not very noticeable mustache. Fells testified he had worn that kind of mustache for many months, so presumably he had such a mustache on the day of the attack. Concerning Mrs. Knowlton's description of defendant's hair, the difference between somewhat kinky and somewhat wavy, a little curly, hardly seems significant, particularly in light of the testimony of defendant's mother that his hair had been straightened and was in the process of returning to its natural condition.

Mrs. Knowlton also testified that her attacker was about 6' tall. Fells later claimed that he was 5' 9" tall barefoot. However, he also admitted owning a pair of elevator shoes. He could have been wearing them at the time of the attack. There was no independent examination of Fells at trial to verify his height. The photographs in the record of Fells standing in front of height bars show him variously 5' 10" to 6' 1". The difference of height can be explained by the fact that Fells may have been wearing elevator shoes at the time the pictures were taken. Moreover, the difference of only a couple of inches between Fells' true height and that estimated by Mrs. Knowlton does not seem significant.

Mrs. Knowlton testified that her attacker had on a brown leather coat with black stripes. Several other witnesses testified that Fells did not have a brown leather coat with black stripes, but Fells did testify that he had a brown knee-length leather coat that he actually wore on the day of the incident. In summary, the accuracy of Mrs. Knowlton's description was a matter of credibility for the jury. Since the incident occurred after dark, the jury could well have believed that what Mrs. Knowlton described were actually shadows resulting from folds in the leather, rather than specific black stripes.

Fells argues that Mrs. Knowlton did not have enough time to observe her attacker because of the brevity of the incident and darkness. However, Mrs. Knowlton testified that she and her assailant stood face to face less than a foot apart, for about one minute, forty-five seconds, before her glasses were knocked off. This was more than sufficient time for an image of defendant's face to have been burned into her memory. In *Zdiarstek v. State* [4] this court found a much shorter fifteen-to-twenty-three-second period of observation sufficient. The court's language is equally applicable here:

". . . While such a period of time may seem short in some instances, to an individual faced with armed robbers, that same period might well seem to be an eternity." [5]

Concerning the darkness, the incident did occur at 6:45 p.m. on December 20th. Mrs. Knowlton testified it was dark and that street lights were on. She admitted there were no street lights "real near" where the attack took place, and that location was "not very well lit." Such conditions do not, however, compel a conclusion as a matter of law that Mrs. Knowlton had an insufficient opportunity to observe her assailant. She stood less than

---

[4] (1972), 53 Wis. 2d 420, 427, 192 N. W. 2d 833.
[5] *Id.*

a foot away from him. She never stated that the lighting was so poor she could not see. Indeed, her testimony describing her attacker indicates she could see him.

A passing motorist, James Spanos, who drove Mrs. Knowlton to the hospital, testified that while he was driving down Hampton Avenue he observed a black man about 6′ tall, with a not very bushy Afro-style hairdo, striking Mrs. Knowlton about the head and beating her to the ground. When he stopped his car the man fled. Spanos then drove around the block and returned to assist Mrs. Knowlton. This testimony certainly lends support to the identification testimony of Mrs. Knowlton.

The prosecution presented another identification witness, Officer David Toepfer. He testified at the trial that he visited Mrs. Knowlton in the hospital on December 25th and showed her seven "mug shots" telling her there was a possibility that one of them was of the suspect. Toepfer testified that Mrs. Knowlton then pointed to the picture of Fells.

The principal defense by Fells on the matter of identification was that he had an alibi to the effect that he was at the home of his mother-in-law and sister-in-law from 5 to 10 p.m. on December 20th. Fells testified that he had gone there to visit his estranged spouse. The evening was particularly noteworthy because, among other things, their artificial Christmas tree was put up then. The mother-in-law testified that Fells never left the living room during his entire five-hour visit.

The situation presented is a classic one in which the jury is asked to pick between the two competing stories and to judge the credibility of all of the witnesses. The jury was entitled to disbelieve the alibi defense and to accept the eyewitness identification of Fells by the victim, Mrs. Knowlton.

We conclude, therefore, that the evidence was sufficient to support the identification of Fells by Mrs. Knowlton.

**2. *Did the state prove that the assailant had an intent to kill?***

After beating Mrs. Knowlton's head with the butt of the gun, the assailant fired a shot into her abdomen at almost point-blank range. A bullet was removed from her liver and she spent nine days in the hospital.

There is a general legal presumption that a person intends the natural and probable consequences of his acts.[6] Where the act is assault with a deadly weapon, the presumption is that the person intended to kill. In *Austin v. State* [7] this court approved the following jury instruction which was used in the instant case:

"Wis J I—Criminal, Part II, 1105, states and we approve the following as an accurate statement of the law:

" ' . . . If one person (assaults another violently with a dangerous weapon, likely to kill), . . . then when there are no circumstances to prevent or rebut the presumption, the legal and natural presumption is that death was intended.' "

Similarly, in the recent case of *Holmes v. State* [8] the court said:

" . . . ' . . . When one intentionally points a loaded gun at the vital part of the body of another and discharges it, it cannot be said that he did not intend the natural, usual, and ordinary consequences. . . . ' "

Since the assailant fired the gun into Mrs. Knowlton's viscera, that fact alone establishes intent to kill, in the absence of evidence rebutting this presumption.[9]

---

[6] *Gelhaar v. State* (1969), 41 Wis. 2d 230, 243, 163 N. W. 2d 609; *State v. Carlson* (1958), 5 Wis. 2d 595, 604, 93 N. W. 2d 354.

[7] (1971), 52 Wis. 2d 716, 721, 190 N. W. 2d 887.

[8] (1974), 63 Wis. 2d 389, 401, 402, 217 N. W. 2d 657, quoting *Eckman v. State* (1926), 191 Wis. 63, 77, 209 N. W. 715.

[9] *Cf. Zebrowski v. State* (1971), 50 Wis. 2d 715, 722, 185 N. W. 2d 545, where in upholding a first-degree murder conviction arising from a stabbing the court said: ". . . The requisite intent can be inferred from the act of stabbing the deceased alone. The

Fells suggests that three pieces of evidence establish that the assailant had no intent to kill. We disagree.

First, Fells argues the evidence shows that the assailant accidentally discharged the gun in a reflex action after being struck by Mrs. Knowlton. Careful examination of the record reveals this theory to be in error. The only testimony material to this point is from Mrs. Knowlton. She said that events occurred in the following sequence: (1) assailant struck Mrs. Knowlton on the back of her head; (2) she struck his right arm, the arm holding the gun; (3) using his right arm he then struck Mrs. Knowlton on her forehead with the gun, knocking off her glasses; (4) assailant fired the gun into her abdomen. She testified that approximately twelve seconds elapsed between her hitting the assailant's arm and the firing of the gun. In this interval, he used his arm to strike her on the head. Thus it is evident that the attacker did not fire reflexively after being hit. He remained in full control of both his arm and the situation. Mrs. Knowlton struck him only once, with an apparently ineffectual blow. Fells' version of the facts is similarly unsupported by the testimony of the passing motorist, James Spanos, who said he saw the attacker striking Mrs. Knowlton about the head and beating her to the ground.

Second, Fells argues that the absence of such words as "I'll kill you" rebuts the presumption of intent to kill. However, the presumption derives from the fact of the shooting itself where there is no other such evidence. If the assailant had used words of intent, reliance on the presumption would not even be necessary. Furthermore, the absence of such words here does not in the circumstances compel a conclusion that no intent to kill existed. The assailant pointed the gun directly into Mrs. Knowlton's abdomen and in a demanding voice ordered her to

defendant is presumed to intend the natural and probable consequences of his act. *Gelhaar v. State* (1969), 41 Wis. 2d 230, 243, 163 N. W. 2d 609."

surrender her purse. Certainly there was an implied threat to shoot if the demand were refused. When Mrs. Knowlton did refuse, the threat became a reality.

Finally, Fells relies on the fact that only one shot was fired. Fells reasons that if the attacker had truly intended to kill he would have fired several shots. However, the attacker may have felt one shot at close range would be sufficient. Furthermore, there is evidence that the attacker fled after James Spanos stopped his car nearby. Running out of fear of detection after firing a shot does not establish any lack of intent to kill.

Thus, we conclude that the evidentiary arguments advanced by Fells, viewed separately or together, are insufficient to rebut the presumption of intent to kill.

3. *Did the trial court properly admit evidence of Mrs. Knowlton's identification of defendant?*

Mrs. Knowlton identified Fells at trial as her attacker, and testified to picking him out of a lineup on January 18th and also identifying his picture on December 25th. Fells does not argue that the trial and lineup identifications were improper in and of themselves, but that the photographic identification was improper, and that the subsequent identifications were thereby tainted. Two questions are thus presented: First, was the photographic identification improper? If evidence of this identification was properly admitted, that is the end of the matter.[10] If not, however, the second question presented is whether the subsequent identifications resulted from an independent source and thus were free of taint. Fells has the burden of proof on the first question, and the state has the burden on the second.[11]

As the United States Supreme Court held in *Neil v. Biggers,*[12] evidence of pretrial identification may not properly be introduced at trial where the procedures used

[10] *Jones v. State* (1974), 63 Wis. 2d 97, 108, 216 N. W. 2d 224.

[11] *Holmes v. State* (1973), 59 Wis. 2d 488, 496, 208 N. W. 2d 815.

[12] (1972), 409 U. S. 188, 198, 93 Sup. Ct. 375, 34 L. Ed. 2d 401.

resulted in " 'a very substantial likelihood of . . . misidentification.' " In determining this issue, the reviewing court must first decide if the procedures were characterized by "unnecessary suggestiveness." If such infirmity was present, the court must then decide whether, despite the unnecessary suggestiveness, the "totality of the circumstances" show that the identification was nevertheless reliable. In determining this latter question, *Biggers* indicated the following factors should be considered:

". . . the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation." [13]

Was there unnecessary suggestiveness connected with the photographic identification? Fells urges two instances of suggestiveness: (1) Fells' picture was the only one depicting anyone to be 5′ 11½″ to 6′ 1″ tall, and Mrs. Knowlton had previously told police she believed her attacker was about 6′ in height; and (2) when Detective Toepfer handed the seven photographs to Mrs. Knowlton he said, "I believe the person would be in it."

Fells' first contention, if true, would be evidence of some suggestiveness. If Fells' picture were the only one with height bars, and the only one showing a person to be about 6′ tall, two problems would be presented. His picture would not only be unique, but unique in a manner directly related to an important identification factor. This would be more serious, for example, than if Fells' picture were in color and the others in black and white. [14]

[13] *Id.* at pages 199, 200. Wisconsin cases citing *Biggers* with approval: *Jones v. State* (1974), 63 Wis. 2d 97, 108, 216 N. W. 2d 224; *Pate v. State* (1973), 61 Wis. 2d 25, 30, 211 N. W. 2d 495; *State v. Russell* (1973), 60 Wis. 2d 712, 721, 211 N. W. 2d 637.

[14] *Holmes v. State* (1973), 59 Wis. 2d 488, 497, 208 N. W. 2d 815.

However, the record is insufficient to support Fells' contentions. Only three of the seven photographs viewed by Mrs. Knowlton are contained in the record. Two depict Fells' head against a backdrop of height bars—a side view showing him to be 6′ 1″ and a front view showing him to be 5′ 11½″. A third picture without height bars, shows a side view of one William Harris who was apparently arrested, along with Fells, in another unrelated incident. Without the other four pictures, however, it is impossible to conclude that the presence of height bars in Fells' pictures was suggestive. As far as the record reveals, the other pictures could also have had height bars and shown individuals to be approximately 6′ tall.

Concerning Fells' second contention, the statement by Detective Toepfer does not appear unnecessarily suggestive. In the very act of handing photographs to an attack victim it is implied that the attacker's picture could be among them and Detective Toepfer merely stated this. Unless the whole process of photographic identification is to be discarded, this could not be considered improper. A different case would be presented if, instead, he had stated that the police had positive evidence that one of the persons pictured committed the crime, or had indicated in any way which person he suspected. The statement here, without more, was not impermissible.

Since we conclude that the photographic identification was not unnecessarily suggestive, it is not required to further examine whether the photographic identification was otherwise reliable, or whether the subsequent lineup and courtroom identifications were tainted. However, it seems clear that neither of these issues would present a problem.

Judged by the factors listed above, discussed by *Biggers*, the photographic identification was "otherwise reliable." Mrs. Knowlton viewed her attacker at very close range for over a minute and a half, and obviously paid close attention to him. The photographic identification

occurred only five days after the attack, and she had no trouble identifying Fells. As discussed fully above, Mrs. Knowlton's description of the attacker and his clothes differs in certain ways from testimony at trial concerning Fells' appearance and apparel. However, these differences are not so serious that they create a question as to whether Mrs. Knowlton got a good look at her attacker. .

For similar reasons we are satisfied that the lineup and courtroom identifications were free of any taint from the prior photographic identification. The facts in the instant case closely resemble those in *Rozga v. State* [15] where the court held a courtroom identification by an attack victim was untainted by a prior improper identification. The court said:

"The defendant was identified in court on a basis sufficiently distinguishable and independent of the improper one-to-one confrontation. The in-court identification clearly purged itself of any primary or prior taint. . . . Rita observed the defendant throughout his attack. The incident was a direct eye-to-eye confrontation between the defendant and herself. She not only testified that she observed the defendant but even saw and described the weapon he used. The identification was based on her own personal knowledge and observation at the time of the offense. She had more than a sufficient opportunity to see his face. She even talked with him and scuffled with him when he attacked her. The lack of taint on the in-court identification is further borne out by the fact that she never made any erroneous identifications." [16]

Thus we conclude that none of the identification procedures employed here prejudiced Fells' right to a fair trial.

In his postconviction motion under sec. 974.06, Stats., Fells contended that additional evidence was at hand which called for a new trial. He contended that Officer Walter Puhlmann, a Milwaukee police detective who in-

---

[15] (1973), 58 Wis. 2d 434, 206 N. W. 2d 606.
[16] *Id.* at page 443.

vestigated the incident, was guilty of perjury when he testified at the trial that the "mug shots" of Fells, later identified by Mrs. Knowlton, were taken between 6 and 7 p.m., at which time Fells was wearing shoes with elevated 1½ to 2″ heels. By his postconviction motion, Fells contended that Puhlmann was committing perjury specifically in stating that Fells was wearing high heels at the time of the picture taking and that he further committed perjury when Puhlmann testified that he could not recall ever seeing Fells wearing tennis shoes.

To support his request, Fells relies on two pieces of evidence—a full length photograph of Fells wearing tennis shoes, taken at 8:10 p.m. on December 24th, and ten pages of a transcript of an unrelated case involving another armed robbery charge against defendant, purportedly showing that Puhlmann was present while this full length picture was taken.

Concerning the picture, proof that Fells wore tennis shoes at 8:10 p.m. does not constitute proof that he also wore tennis shoes earlier in the evening. There is nothing in the record to indicate that he could not or did not change his shoes in the interval.

Concerning the partial transcript, although the parties stipulated that it could be included in the appeal record, the stipulation nowhere states what it is a transcript of. The ten pages are nonconsecutive pages, the speakers are, for the most part, unidentified, and the pages appear to include some pretrial proceedings as well as testimony received in a trial. Moreover, the transcript is not presented as part of any affidavit and does not bear the imprimatur of any shorthand reporter verifying the accuracy as required by sec. 889.11, Stats.[17] Without

[17] Sec. 889.11, Stats., provides: "Reporter's transcript as evidence. Any writing certified by the official reporter of any court to have been carefully compared by him with his minutes of testimony and proceedings taken on any trial or hearing in such court, and to be a true and correct transcript of all or a specified portion

such certification the partial transcript cannot be considered competent evidence.[18] Finally, the record does not show that the partial transcript was ever presented in the lower court; the lower court's decision denying postconviction relief never refers to it. In light of these substantial defects we do not think we should even consider the partial transcript.

Even if it were properly before the court, however, it is wholly insufficient to establish that Officer Puhlmann was present when the 8:10 p.m. photo was taken. The partial transcript does not contain any testimony by Puhlmann himself; rather, another unidentified officer testifies to being with defendant from 5 to 9:30 p.m. on December 24th and interrogating him. He said that Puhlmann had also interrogated defendant on the 24th, but the transcript gives no indication when this occurred.

We conclude that the evidence presented by Fells falls far short of establishing any palpable untruth [19] in Officer Puhlmann's testimony.

Since we conclude that Fells did not present evidence of perjury by Officer Puhlmann it is unnecessary to reach the additional issue of whether the knowing use of perjury by the prosecution is per se prejudicial, or whether actual prejudice must be shown.

*By the Court.*—Judgment and orders affirmed.

---

of such minutes, and to be a correct statement of the evidence and proceedings had on such trial or hearing, shall be received in evidence with the same effect as the oral testimony of such reporter to the facts so certified."

[18] In *Wells v. Chase* (1905), 126 Wis. 202, 207, 208, 105 N. W. 799, the court held that a transcript from a prior proceeding was inadmissible unless the requirements of sec. 4141, Stats. 1898 (now sec. 889.11, Stats.) were met: ". . . The evidence offered was not certified to by such reporter, as required by this statute, nor was proof made of the facts required to be so certified. It follows, therefore, that the testimony . . . was improperly admitted."

[19] *See, Anderson v. United States* (7th Cir. 1968), 403 Fed. 2d 451, 454, certiorari denied (1969), 394 U. S. 903, 89 Sup. Ct. 1009, 22 L. Ed. 2d 215.