STATE, Respondent, v. DAVIS, Appellant.

*No. State 147. Argued January 2, 1975.—Decided February 5, 1975.*
(Also reported in 225 N. W. 2d 505.)

For the appellant there were briefs by *James M. Shellow, Stephen M. Glynn* and *Shellow & Shellow*, attorneys, and *James A. Walrath* of counsel, all of Milwaukee, and oral argument by *James M. Shellow*.

For the respondent the cause was argued by *William L. Gansner*, assistant attorney general, with whom on the brief was *Victor A. Miller*, attorney general.

CONNOR T. HANSEN, J.   Allean Mosley was killed during the night of April 5–6, 1972.  At the time, she was living in a single-family residence in Milwaukee, with her daughter, Robin.  She had been associating with the defendant for about four years after her divorce from Richard Mosley in 1967.  The defendant had been to the Mosley house on numerous occasions and was well known to the victim's daughter, Robin.

The victim's mother, Mrs. Alberta Ford, who lived in the house directly behind that of the victim, testified that on March 27, 1972, the victim had attempted to break up with the defendant and begged him to leave her alone. She further testified that the defendant had a gun and that he had made several threatening comments to the victim.

Marvin Hugh Nunn, a school teacher and part-time bartender at the Town House cocktail lounge at which the victim also worked part time, testified as to an incident in March, 1972, between the defendant and the victim wherein the defendant allegedly knocked the victim off a bar stool, grabbed her around the throat and slapped her.

Detective Roosevelt Harrell testified for the state that in a post-arrest statement given by the defendant, he admitted that about a week prior to the alleged murder he had caused a disturbance at the victim's home and that the victim had called the police. The defendant's statement also noted that Allean had been associating with another man from out of town and that the defendant did not approve. The disturbance between defendant and the victim related to her seeing this other man. Defendant also told Detective Harrell that he, the defendant, owned four guns. James Perlewitz, a Milwaukee police detective, testified that the victim had been dating a man named Brown from Racine and had been using Brown's Cadillac while her car was being fixed.

Eddie Donaldson, Jr., an insurance salesman who worked with the victim, testified that he observed a fight between the victim and the defendant at the victim's birthday party in May, 1971, wherein the defendant pushed the victim down and struck her numerous times.

The principal witness for the state was the victim's daughter, Robin, who was six years old at the time of the alleged murder, and eight years old at the time of the trial. Robin testified that she and her mother were home watching television in the bedroom on the night of April 5, 1972. She stated that her father, Richard Mosley, called the home while they were watching television and that they talked for a short while. Shortly after her father called, and while the same television program was on—although she could not remember the name of the program—the doorbell rang. She stated that her mother told her to stay in the bedroom as her mother answered the door.

At this point there was a divergence in Robin's testimony. Her first testimony was that she remained in the bedroom, did not see the defendant, but heard and recognized his voice. She later was recalled to the stand, by

order of the trial court, when it was determined that she wished to change her story. She then testified that she peeked into the living room and saw the defendant. At one point after she was recalled, she also testified that she did not see the defendant. However, her final testimony to the jury was that she had seen the defendant.

Robin testified that after the defendant arrived, he and her mother got into a loud argument about a Cadillac that was parked in the driveway next to the victim's residence. She testified that the Cadillac was owned by David Brown. She stated that after the argument she heard a shot. When it was quiet she fell asleep. She later woke up, found the television still on, but no program on it, and went into the living room. There she discovered her mother lying on the floor. She began to cry and then called the police. She also called her father, but did not remember what she had said to him.

Richard Mosley, the victim's former husband, testified for the state that he had phoned the victim at approximately 9:20 p. m. on April 5, 1972. He also testified, over objection, that Robin called him shortly after 5 a. m., April 6, 1972, and stated, " 'daddy, daddy, Wilbur killed mommy.' "

Annie B. Winters, the victim's next-door neighbor at the time of the incident, and Mrs. Ford, the victim's mother, both testified they heard a loud noise between 10:40 and 10:50 p. m. on April 5, 1972. Mrs. Ford characterized it as a shot. The pathologist who performed the autopsy on Allean Mosely, Dr. Helen Young, testified that the victim's death was caused by a single gunshot wound in the head, the gun having been in contact with the head at the time it was fired.

At the time of the defendant's arrest on the morning of April 6, 1972, he put on a pair of trousers which were subsequently found to contain a bloodstain of type A neg. blood. This was the same blood type as the victim but was not the same blood type as the defendant. There was

a dispute in the evidence as to whether the arresting officers, at the time of the arrest, told the defendant to put on the same clothes he was wearing the night in question, or whether he was just handed clothes to wear without comment. The trousers were the subject of a pretrial motion to suppress, which was denied by the trial court on July 2, 1973. The defendant presented testimony by other people who had seen him the night in question, to the effect that he was wearing a blue suit and not the trousers which contained the bloodstain.

The defendant's alibi witnesses testified that he was in the Main Event bar from 8 p. m. until 10 p. m., April 5th; that he then went to the Town House lounge and remained until approximately 10:20 p. m.; that he returned to the Main Event bar arriving about 10:45; that he left the Main Event bar at 11:45; and, that he then went to the Omega Club, arriving about 12 and remaining continuously in someone's presence until 3:30 a. m. on April 6th. The defendant admitted that the route he took between the Town House and the Main Event would have brought him within a block-and-one-half of the victim's home.

The defendant also called several character witnesses who established that the defendant had been the director of the LaVarnway Boys' Club and had worked for the Joseph Schlitz Brewing Company in the industrial relations department as Director of the Department of Urban Affairs, and that he had an impeccable reputation in the community for truth and veracity. It was also established that the defendant was a college graduate; had been very active in community affairs, serving on several boards and committees; and, that he had received awards for his community involvement.

Appellate counsel, after his apparent meticulous search of the trial record, raises numerous issues. We perceive them to be as follows:

1. Did the trial court err in determining that the child witness was competent to testify?

2. Did the trial court err in permitting the child's testimony without requiring an oath or solemn promise to tell the truth?

3. Did the trial court err in admitting two out-of-court statements of the child witness?

4. Did the trial court err in denying the motion for mistrial and in requiring the state to recall the child witness to disclose that she had lied in her previous testimony?

5. Did the trial court abuse its discretion in failing to grant a continuance after it was disclosed that the child witness had lied in her former testimony?

6. Did the trial court err in suppressing the subpoena served on the prosecuting attorney?

7. Did the trial court err in not granting a mistrial upon the insertion of unsworn testimony by the prosecuting attorney?

8. Did the trial court err in refusing to suppress the physical evidence of the defendant's trousers allegedly worn on the night of the murder?

9. Did the trial court err in not giving a reputation instruction?

10. Did the trial court err in excluding testimony tending to establish a possible motive on the part of the victim's ex-husband?

11. Should a new trial be granted in the interest of justice?

It is readily observed that many of the issues raised relate to the testimony and statements of Robin Mosley. Appellate review requires review of the record in light of the totality of the circumstances and the broad discretion of a trial court as to the admission of testimonial evidence of a child six years of age at the time of the

alleged murder of her mother, and eight years of age at the time of the trial, some eighteen months later.

### Competency of child.

The defendant contends that the trial court erred in failing to strike the testimony of Robin or declare a mistrial at such point as he claims it became apparent that she was an incompetent witness. The defendant claims that the competency of Robin was never properly determined by the trial court and that, in addition, the lack of competency became more apparent as she testified due to the inconsistencies in her story, the questions she was unable to answer, and the changing of her testimony with regard to seeing the defendant on the night in question which necessitated her being recalled to testify at the trial court's insistence.

In holding that tender age is no bar to testimonial competency, this court in *Collier v. State* (1966), 30 Wis. 2d 101, 106, 140 N. W. 2d 252, reiterated the requirements for establishing that competency as follows:

". . . All that this jurisdiction requires is evidence of 'his ability to receive accurate impressions of the facts to which his testimony relates and to relate truly the impressions received. If he has this understanding and intelligence and appreciates the obligation to speak the truth, he is competent.' *Musil v. Barron Electrical Cooperative* (1961), 13 Wis. (2d) 342, 358, 108 N. W. (2d) 652. . . ."

*See also: Love v. State* (1974), 64 Wis. 2d 432, 219 N. W. 2d 294.

In a situation where the competency of a witness is in doubt, this court has required that the trial court attempt to determine whether the witness meets the above-quoted requirements. *DeGroot v. Van Akkeren* (1937), 225 Wis. 105, 273 N. W. 725. *See* sec. 885.30, Stats. The deter-

mination of the trial court relative to the competency of a witness to testify rests in the sound discretion of the trial court and will only be disturbed on appeal if there is a clear abuse of discretion. *Collier v. State, supra,* page 106.

The defendant contends that the *voir dire* conducted of the victim's daughter fell short of establishing the requirements of *Collier v. State, supra,* in that it did not demonstrate that Robin had the ability to receive accurate impressions of the facts to which her testimony was to relate.

*Collier v. State* requires that the *ability* to receive accurate impressions be evidenced. That ability can be demonstrated as well by questions and answers relating to independent facts as it can by questions and answers relating to the particular facts about which her testimony will relate. The record of the *voir dire* in this case conclusively demonstrates that Robin had the ability to answer questions about her age, schooling, the names of her teachers, the names of her relatives, her birthday, where she lives, the church she attends, the church she used to attend, and the names of people she was with when she went to such places as the zoo. These types of questions were precisely the types asked of the seven-year-old witness in the *Collier Case* wherein this court sustained the determination of the trial court that the witness was competent to testify.

The record reflects that Robin was found competent to testify not once, but four times. The first was by the Hon. THOMAS J. O'BRIEN, pursuant to a *voir dire* examination held prior to the preliminary examination. The second ruling was by the Hon. CHRIST T. SERAPHIM at a hearing on pretrial motions wherein he relied upon the testimony of the witness at the preliminary examination in reaching his determination. The third determination was made by the trial court pursuant to the

*voir dire* conducted before Robin first took the stand at the trial. The fourth ruling was also by the trial court following an additional *voir dire* of the witness held after it had been disclosed that Robin wanted to change her story about not having seen the defendant on the night in question. This last ruling by the trial court was based on all the former testimony of the witness, including that given at the preliminary hearing. At the time of the latter ruling of the trial court, he had the benefit of substantial testimony of the witness which related the events of the day in question in great detail.

The defendant places much emphasis on the inconsistencies which developed in Robin's testimony as being indicative of her lack of competency to testify. The most outstanding of the inconsistencies was her changed story with regard to whether she saw the defendant on the night in question.

This court has held that where a proper determination of competency has been initially made by the trial court, subsequent discrepancies in the witness' testimony would not be proper grounds for striking the testimony, but would merely create an issue of credibility for the jury. *DeGroot v. Van Akkeren, supra,* page 114. This position has been extended by the current rules of Wisconsin evidence wherein every witness is competent to testify (with certain noted exceptions) and that all former competency issues now are issues of credibility to be dealt with by the trier of fact. *See:* sec. 906.01, Stats.; 59 Wis. 2d Rp. 157, effective January 1, 1974, and comment following.

Based on a complete review of the record, we conclude that the trial court did not abuse its discretion in determining that Robin was competent to testify. Thus, the trial court did not err in permitting Robin's testimony to go to the jury for an assessment of credibility.

*Unsworn testimony.*

The defendant contends that not only was the testimony of Robin unsworn, but that the trial court at no time elicited a solemn promise from her that she would tell the truth.

This court has previously held that it is not necessary to require a child to be formally sworn before testifying so long as the child solemnly promises to tell the truth. *DeGroot v. Van Akkeren, supra,* page 114; *State ex rel. Shields v. Portman* (1942), 242 Wis. 5, 6 N. W. 2d 713. *Cf.* sec. 906.03; 59 Wis. 2d Rp. 161, effective January 1, 1974, and comments following. The decision in the *DeGroot Case* has two prongs. The first prong is the question of whether the child understands the difference between the truth and a lie. The second prong relates to the question of whether, given such understanding by the witness, she feels an obligation to tell the truth.

In the present case, the record discloses that the witness was extensively questioned, not only by the court but by the counsel for the state and counsel for the defendant, as to her ability to distinguish between telling a lie and telling the truth, and as to whether she would be punished if she told a lie. There was a sufficient basis in the record for the trial court to conclude that Robin could make the requisite differentiation.

The trial court, at the close of the in-chambers *voir dire,* ruled that Robin would be permitted to testify without being sworn. Counsel for the defendant then reiterated his standing objection to the competency of the witness which had consistently been based on the alleged inability of the witness to receive and relate impressions relative to the facts about which she was to testify. He made no objection to the lack of an oath or solemn promise. Nor was her willingness or ability to tell the truth ever questioned. The trial court then informed the jury that Robin

was going to testify without being sworn. Counsel for the defendant made no objection. When the fact that Robin had lied in her former testimony about not seeing the defendant was made known, counsel for the defense questioned whether the trial court had correctly determined that she could distinguish between the truth and a lie, but again made no motion with regard to the failure of the trial court to obtain a promise from her to tell the truth. The trial court again undertook an extensive *voir dire* of Robin to determine the extent to which she understood the difference between the truth and a lie and her obligation to tell the truth. On the basis of this questioning, the trial court again ruled that Robin was competent in this regard. When Robin was recalled to the stand, the trial court specifically elicited her promise to testify truthfully.

Based on a review of the record, we are of the opinion the trial court did not abuse its discretion in finding Robin competent with regard to her ability to differentiate between the truth and a lie and her obligation to tell the truth, nor did it abuse its discretion in permitting her to testify. *Collier v. State, supra, DeGroot v. Van Akkeren, supra.*

### Hearsay statements.

#### Robin's statement to her father.

On the morning of April 6th, shortly after Robin discovered her mother lying dead on the living room floor, she called her father and according to the father's testimony, stated to him, " 'daddy, daddy, Wilbur killed mommy.' " The testimony of the father concerning this statement was admitted despite objection by the defendant that it was inadmissible hearsay.

The defendant challenges the court's ruling that the statement fell within the *res gestae* exception to the hear-

say rule on the ground that the statement was not based on the personal perception and observation of the declarant, Robin.

In *Rudzinski v. Warner Theatres* (1962), 16 Wis. 2d 241, 247, 114 N. W. 2d 466, this court approved Rule 512 of the American Law Institute's *Model Code of Evidence*, quoting it as follows:

" 'Evidence of a hearsay statement is admissible if the judge finds that the hearsay statement was made (a) while the declarant was perceiving the event or condition which the statement narrates or describes or explains, or immediately thereafter; or (b) while the declarant was under the stress of a nervous excitement caused by his perception of the event or condition which the statement narrates or describes or explains.' "

*See also: Shoemaker v. Marc's Big Boy* (1971), 51 Wis. 2d 611, 187 N. W. 2d 815; *State v. Smith* (1967), 36 Wis. 2d 584, 153 N. W. 2d 538.

The defendant is correct in asserting that in order for this statement to be admissible under (b) of that rule, there is some requirement that the declarant's statement be based on personal knowledge and observation. 2 Wharton's, *Criminal Evidence* (13th ed. 1972), p. 93, sec. 301; McCormick, *Evidence* (2d ed. hornbook series), p. 705, sec. 297; *Annot.* (1940), 127 A. L. R. 1030. On the other hand, it is also true that a declarant, as any other witness, may gain the requisite personal knowledge by observation using senses other than sight. 58 Am. Jur., *Witnesses*, p. 90, sec. 114; 97 C. J. S., *Witnesses*, pp. 441, 442, sec. 53. Thus, a witness who hears and can identify the voice of a person because of familiarity with it has been held competent to testify as to identity. 58 Am. Jur., *Witnesses*, p. 90, sec. 114; 97 C. J. S., *Witnesses*, p. 442, sec. 53.

Robin, the declarant, also testified as a witness to the effect that she heard the defendant enter the home;

heard him arguing with the victim; recognized his voice; heard a shot after the argument; and subsequently found her mother dead on the living room floor. Based on such evidence of personal observation, the defendant's claim of a lack of personal knowledge on the part of the declarant is not meritorious.

*Robin's statement to police.*

On the morning of April 6th, at approximately 6:30, Robin was interviewed by police officer Thomas Jackelen, who was subsequently called by the state to testify as to the responses of Robin to his questions on that morning. The interview took place within two hours of the time that Robin discovered her mother's body. Officer Jackelen testified that Robin was quite upset during the interview and often cried. The interview was subsequently terminated by Robin's father.

The statement essentially corroborated the direct testimony of Robin in all but two regards. In the statement to the police, Robin indicated that she had not heard a shot, and that she had not seen the defendant on the night in question.

At the time that it first became apparent that the state wished to get the statement into the record, the defendant's counsel objected on the basis that it was hearsay. The trial court ruled that it was admissible under the *res gestae* exception. (Described in the recently adopted Rules of Evidence as an excited utterance. Sec. 908.03 (2), 59 Wis. 2d Rp. 250 and Rp. 256.) It was at this point that the parties were first informed that Robin wished to change her story with regard to seeing the defendant on the night in question. The trial court then disclosed that it did not want the officer to testify as to the statement until the state determined whether it was going to recall Robin to disclose her change in story.

Defense counsel had a copy of the report from which the officer was to testify. Counsel then stated he would waive his objection and let the officer continue his testimony with the understanding that Robin would be called back as a witness.

The officer was then permitted to testify as to the statement without further objection by counsel for the defendant. Subsequently the trial court ruled that the state was obligated to recall Robin, which was done.

It is obvious that as a trial tactic, counsel for the defense realized the value of having the prior statement of Robin in the record after it was disclosed that Robin now wished to change her story as contained in the statement and as testified to when she was first on the stand with regard to seeing the defendant on the night in question. The value of the statement for purposes of impeachment if Robin was to be recalled rose sharply. As the circumstances developed the statement was at least as valuable to the defense as to the state. Under such circumstances, it is felt that the prior objection by the defendant was expressly waived.

### Recalling of Robin.

The defendant contends that the trial court erred in denying his numerous motions for a mistrial on the basis of the changed testimony of Robin in regard to seeing the defendant on the night in question and in allowing the state to recall her.

The disclosure that Robin wished to change her story was made after her initial testimony and out of the presence of the jury. The prosecutor's disclosure of the information comported with his duty as set forth in *Giglio v. United States* (1972), 405 U. S. 150, 92 Sup. Ct. 763, 31 L. Ed. 2d 104; *Brady v. Maryland* (1963), 373 U. S. 83, 83 Sup. Ct. 1194, 10 L. Ed. 2d 215; and *Napue*

*v. Illinois* (1959), 360 U. S. 264, 79 Sup. Ct. 1173, 3 L. Ed. 2d 1217.

In resolving this issue, the trial court determined that the defendant had not been sufficiently prejudiced to warrant a mistrial, and that if a mistrial were declared, the same problem would arise at a subsequent trial. After recalling Robin for additional examination out of the presence of the jury, the trial court determined that it was necessary that Robin be recalled to the stand. In that way, the jury would be informed of the discrepancy in Robin's story so as to permit it to correctly weigh her credibility. The option to recall Robin was offered to both the defense and the state, but when both sides refused the option, the trial court ordered the state to recall her. The fact that Robin changed her story benefited the defendant because of the potential for impeachment, but the new version of Robin's story was more favorable to the state than her former testimony.

On appeal, the defendant's position, reduced to its essentials, is that the option as to how the newly discovered evidence should have been considered was solely with him. Such, of course, is not the fact.

In *State v. Nutley* (1964), 24 Wis. 2d 527, 561, 562, 129 N. W. 2d 155, this court affirmed the trial court's exercise of discretion in examining a witness, stating:

"As to the propriety of the court examining witnesses in order to clarify ambiguities or uncertainties, Federal Judge LEARNED HAND, speaking for the court of appeals for the Second circuit, has stated:
" 'It is permissible, though it is seldom very desirable, for a judge to call and examine a witness whom the parties do not wish to call. A judge is more than a moderator; he is charged to see that the law is properly administered, and it is a duty which he cannot discharge by remaining inert.' "

Under the circumstances of this case the trial court did not err in denying the defendant's motion for a mis-

trial or in exercising its discretion in requiring the state to recall the witness.

### Continuance.

The defendant next contends that the trial court erred in failing to grant a continuance at the point when it was indicated that Robin wished to change her story. The prosecutor, at one point, notified the court that Robin had been told by one of her relatives not to mention seeing the defendant. Defendant relies on this statement in pointing out that a continuance was necessary in order to investigate whether Robin's relatives had influenced her testimony in any other regard.

We are of the opinion that the defendant was not placed in such an unfair position by the revelation that Robin wished to change her testimony so as to require granting a continuance. The defendant did not seek the continuance because Robin changed the substance of her testimony, rather because of the disclosure that Robin's relatives allegedly influenced her testimony. Properly viewed, two issues are then raised: (1) Was there any basis for believing that Robin was influenced by her relatives; and (2) if so, did that revelation come as a surprise for which defendant was unprepared?

Counsel for the defense was first informed that Robin had changed her story because she was alleged to have received some direction by one of her relatives, the prosecutor who reported this was uncertain as to her reasons and indicated that the assistant prosecutor was talking with the witness to get the correct story. The assistant prosecutor, Charles Clevert, reported that the primary reason Robin had lied was because her mother, on the night of the killing, had told her to stay in the bedroom and that Robin feared she would be punished for disobeying her mother if she told anyone that she

had peeked out of the bedroom and seen the defendant. At the subsequent *voir dire* ordered by the trial court, Robin stated she had told the lie because she was scared. She didn't know why she was scared, but testified that her mother would give her a whipping if Robin disobeyed her. After Robin was recalled, she repeatedly responded "No" to the defendant's questions as to whether anyone had told her what to say. Robin had similarly denied that anyone had told her what to say or otherwise tried to influence her testimony when the defense asked the same questions when Robin was first on the stand. Thus, the record reflects little basis for believing that Robin's testimony was being influenced, other than Robin's apparent fear of being punished for disobeying her mother on the night in question. Moreover, any claim that this was a new and surprising development necessitating time for further investigation is not supported by the record. The questions posed by counsel for the defendant when Robin was first on the witness stand, reflect that the defendant had consistently taken the position that someone had been telling Robin what to say when she testified.

The trial court adequately safeguarded the defendant's interest by requiring the additional in-camera *voir dire* of Robin and by requiring her to be recalled to the stand by the state so that the defendant could thoroughly cross-examine her with regard to the inconsistent testimony and the source of any possible influence over her testimony.

A motion for continuance is addressed to the discretion of the trial court. *Rodriguez v. Slattery* (1972), 54 Wis. 2d 165, 168, 194 N. W. 2d 817. In view of the circumstances of this case, as disclosed by a complete review of the record, the trial court did not abuse its discretion in failing to grant a continuance.

*Subpoena of prosecuting attorney.*

The defendant contends that the trial court erred in quashing a subpoena directed at Clevert, the assistant prosecuting attorney, because of the trial court's erroneous belief that if Clevert were to testify for the defense it would require his withdrawal from the case under the Code of Professional Responsibility. The defendant's purpose for calling Clevert was to establish the frequency with which he met with Robin prior to trial and the substance of their conversations.

The record does not reflect that the Code of Professional Responsibility was the basis for the decision of the trial court. Rather, the trial court decided that it would not allow the defense to sequester Clevert as the defense had demanded, thus requiring Clevert's withdrawal from the case.

A thorough review of the record indicates that the ruling of the trial court in no way implied that Clevert could not be called as a witness by the defense but that the court was merely ruling that under the circumstances presented he could not be sequestered, which would consequently require his withdrawal from the case. The question of the sequestration of witnesses is within the sound discretion of the trial court. *Abraham v. State* (1970), 47 Wis. 2d 44, 176 N. W. 2d 349. As the trial court indicated in its decision on the postconviction motions, Clevert was constantly in court and available to be called as a witness. As the defense did not choose to call him, they cannot now claim that his failure to testify was prejudicial.

*Suppression of trousers.*

Prior to the trial, the defendant moved to have the trousers, which he had put on at the time he was arrested

and which subsequently were found to contain a blood-stain of the victim's but not the defendant's blood type, suppressed.

At the suppression hearing the arresting officers testi-fied for the state that the defendant was informed of his arrest, was advised of his constitutional rights, and was told to put on the clothes that he had worn that evening (the night of the alleged murder). Defendant denied that the officers had instructed him to put on any particular clothing and insisted that they merely handed him cloth-ing to put on. The defendant also testified at trial that he did not wear the trousers in question on the night of the incident. Several witnesses also testified he was not wearing the trousers on the night of April 5–6, 1972. The defendant explained the existence of bloodstains on his trousers by testifying that the victim was subject to nose bleeds; that the bloodstains on his trousers were probably the result of such an incident when he and the victim were in a car on a previous occasion.

The trial judge denied the motion to suppress. In doing so, he found there was probable cause to arrest the de-fendant. It is our opinion the facts in the record show that this ruling of the trial court was correct. We would observe that the defendant, in his brief, in summarizing the information available to the police on the issue of probable cause, omits one important fact: Robin had told the police the defendant killed her mother. The arrest being valid, ". . . a search incidental to that arrest is proper, and evidence obtained in that search may be re-ceived in evidence." *State v. Paszek* (1971), 50 Wis. 2d 619, 625, 184 N. W. 2d 836.

### Reputation instruction.

The defendant contends that the instructions of the trial court were deficient in that they did not include an

instruction with regard to the evidence as to the good reputation of the defendant.

The trial court informed the defendant that he would give the standard jury instruction on reputation and by apparent oversight, omitted doing so. At the close of the instructions, and after the jury had retired, counsel for the defense called to the trial court's attention that he had not informed the jury in his instructions that the defendant had pleaded not guilty to the information. The trial court immediately resummoned the jury and gave that instruction. Counsel for the defense made no other objection to the instructions until motions after verdict.

This court has consistently held that the failure to make a timely objection to the instructions of the court constitutes a waiver of any alleged defects in the instructions. *Lampkins v. State* (1971), 51 Wis. 2d 564, 187 N. W. 2d 164; *Mitchell v. State* (1970), 47 Wis. 2d 695, 177 N. W. 2d 833. An objection is not timely if it is made after the time when the error could have been corrected. *Lampkins v. State, supra; State v. Halverson* (1966), 32 Wis. 2d 503, 145 N. W. 2d 739.

The defendant waived any possible assertion of error by failure to make a timely objection.

*New trial in interest of justice.*

In order to grant a new trial in the interest of justice under sec. 251.09, Stats., this court must be convinced, viewing the record as a whole, that there has been a probable miscarriage of justice or that a new trial would lead to a different result. *Rohl v. State* (1974), 64 Wis. 2d 443, 219 N. W. 2d 385; *Pate v. State* (1973), 61 Wis. 2d 25, 211 N. W. 2d 495.

A complete review of the record in this case fails to disclose a basis for believing that justice has miscarried or that a new trial would lead to a different result.

Although this opinion does not discuss all the issues raised by the defendant, the entire record has been reviewed and each of them considered. None of them constitute a basis for reversal.

*By the Court.*—Judgment and order affirmed.