**Wilbur Eugene DAVIS, Petitioner,**

v.

**Thomas R. ISRAEL, Warden, Wisconsin State Prison, Respondent.**

Civ. A. No. 75–C–462.

United States District Court, E. D. Wisconsin.

July 19, 1978.

Stephen M. Glynn, Milwaukee, Wis., for petitioner.

William L. Gansner, Asst. Atty. Gen., Madison, Wis., for respondent.

## DECISION AND ORDER

REYNOLDS, Chief Judge.

Wilbur Eugene Davis has petitioned the Court for a writ of habeas corpus pursuant to 28 U.S.C. § 2241. He is presently in the custody of the respondent warden serving a term of life imprisonment imposed upon him on October 2, 1973, by the Circuit Court of Milwaukee County, the Honorable Jerold E. Murphy presiding, following conviction

of the petitioner for the crime of first degree murder. Petitioner has exhausted his state remedies through an appeal to the Wisconsin Supreme Court. See *State v. Davis,* 66 Wis.2d 636, 225 N.W.2d 505 (1975). The two constitutional issues presently before the Court are petitioner's claim that the admission of his trousers into evidence constituted a violation of his Fifth Amendment right against self-incrimination, and petitioner's claim that the trial court's denial of a continuance after the key state witness, an 8-year-old child and the daughter of the victim, changed her testimony deprived the petitioner of due process of law and effective assistance of counsel in violation of petitioner's Sixth and Fourteenth Amendment rights.[1] The Court has reviewed the relevant portions of the state court record, including portions of the transcripts of the pretrial proceedings and of the trial, and the decision on the post-trial motions in the Circuit Court of Milwaukee County, and has had the benefit of extensive briefs and oral argument of counsel on these issues, as well as amicus curiae briefs submitted by Frank J. Remington, Professor of Law at the University of Wisconsin Law School, Madison, Wisconsin. For the reasons stated hereafter, the Court concludes that the petition must be granted.

On April 6, 1972, Wilbur Eugene Davis was arrested and charged with first degree murder in violation of Wis.Stat. § 940.01. The victim of the killing was Allean Mosley, whose daughter Robin was six years old at the time of the alleged murder, and eight years old at the time of the trial. Robin became the principal state's witness, and she testified that she and her mother were

home watching television in a bedroom on the night of April 5, 1972, and that sometime during the evening the doorbell rang and she was told by her mother to remain in the bedroom while her mother answered the door. Robin originally testified that she remained in the bedroom and did not see the petitioner, but that she heard and recognized his voice. This testimony was consistent with what she had originally told the investigating detectives, and with her testimony at the preliminary hearing and on her first cross-examination at trial. After she was excused, she told the prosecutor that she had in fact seen Davis on the night of the murder. When the Court recalled her on its own motion in the absence of the jury, she testified that she had not seen Davis. When the prosecutor questioned her during this voir dire, she testified that she had seen Davis. During the same voir dire on cross-examination, she stated that she did not know if she had lied in court that morning concerning seeing Davis. In a continuation of the voir dire in chambers, the witness stated that she did see Davis. After she was recalled she testified that she had seen Davis, but she would not state whether she had been lying in her earlier testimony even though the court repeatedly ordered her to answer that question. On cross-examination she testified that she was not telling the truth when she testified that she had seen Davis at the house. On redirect examination, she testified that she did not know which story was true, and finally she testified that she had seen Davis.

Robin testified that after Davis arrived, he and her mother argued over a Cadillac parked in the driveway adjacent to the vic-

1. The petitioner originally set forth four grounds in support of his petition:

(1) utilization of constitutionally tainted evidence in violation of the Fourth, Fifth and Fourteenth Amendments (admission into evidence of the petitioner's blood-stained pants);

(2) deprivation of effective assistance of counsel and of due process of law in violation of the Sixth and Fourteenth Amendments (trial court's denial of motion for a continuance);

(3) denial of the right to confront witnesses in violation of the Sixth and Fourteenth Amendments (admission of certain hearsay evidence under the res gestae exception); and

(4) deprivation of due process of law and denial of a fair trial in violation of the Sixth and Fourteenth Amendments (trial court's refusal to give a reputation instruction to the jury). The petitioner withdrew the third and fourth bases as not cognizable on a federal habeas petition because they are not of federal constitutional dimension, and withdrew the Fourth Amendment search and seizure claim as to the admission of the blood-stained pants in light of the Supreme Court's intervening decision in *Stone v. Powell,* 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976).

tim's house, and that the Cadillac belonged to one David Brown. She testified that after the argument she heard a shot, and that when it was quiet, she fell asleep. Her testimony that she had heard the shot was contrary to statements she had given the original investigating officer. Robin testified that when she woke up, she found the television on, but no program on it, and then she went into the living room, discovered her mother lying on the floor, began to cry, and then called the police.

Davis was arrested on the morning of April 6, 1972, and he put on a pair of trousers which were subsequently found to contain an identifiable spot of blood of the same type as the victim's, but not the same type as the defendant's. The issue of the pants was first raised June 6, 1973, at a hearing on the defendant's motion to suppress the pants as evidence at the trial. At that point, it was the defense theory that the seizure of the pants required a warrant, and alternatively, that the pants would be immaterial to the trial and prejudicial to the defendant since there could be no showing that they were worn on the night of the offense. Officer Ronald Enk testified at that hearing that he and his partner had been despatched to the address of Davis' apartment to meet their superior officer to effect an arrest of Davis as a suspect in the murder of Allean Mosley. He testified that the other two officers had their pistols drawn upon entering the apartment, and that Davis answered the door and was clad only in his underwear. Davis was informed that he was under arrest for the murder of Allean Mosley, and he and two or three of the officers went into Davis' bedroom. At that point, Enk testified, he saw no guns drawn, and: "Then I asked if he would get dressed in the clothes that he wore the previous evening." [Tr. of June 6, 1973, at 26.] Enk testified that Davis picked up some clothes to put on, including a pair of pants, which Enk searched for weapons before giving them to Davis to put on. Upon further questioning by the prosecutor, who inquired as to the exact conversation which occurred with Davis before he put his clothes on, Enk testified:

"Well, after advising him of his rights, I said 'Would you put on the clothes that you had on last evening?' That's when he reached for his pair of pants and that's when I took them from him and searched them." [Tr. of June 6, 1973, at 29.]

Enk also stated that he later asked Davis if the pants he was wearing were the ones he had been wearing the previous evening, and that Davis said they were. [Tr. of June 6, 1973, at 33.] As the other two arresting officers were unavailable on June 6, 1973, the hearing was continued until July 2, 1973.

Captain Daniel Koprowski, another arresting officer, testified in July. He stated that he did not have his revolver out at the moment of arrest, but that he assumed that the two other officers, who went into Davis' apartment, had their guns drawn. [Tr. of July 2, 1973, at 12.] Detective Bottoni testified next and stated that Davis was told to "put on the clothes he wore last." [Tr. of July 2, 1973, at 30.], but that he couldn't recall which officer told Davis that. [Tr. of July 2, 1973, at 31.] The following colloquy took place upon cross-examination of Bottoni:

"Q Okay, and after he was asked to get dressed was he told anything else?

"A Yes, he was told to put on the clothes he wore last.

"Q He was told to put on the clothes he wore last? Which officer told him that?

"A I don't remember.

"Q Pardon?

"A I don't recall.

"Q Well, was it you?

"A It might have been; I don't recall.

"Q It might have been you.

"A It might have been.

"Q Now, prior to telling him that, why did you want him to put on the clothes he had on the night before?

"A Because he was a suspect.

"Q Well, in other words he was suspected of the crime?

"A Yes.

"Q  And you wanted him to put on the clothes he had on at the time the crime was committed?

"A  Right.

"Q  That was in the hopes of possibly solving the crime?

"A  Possibly, sure.

"Q  Possibly to find any stains or fibers or hairs that might assist? It's possible, is that correct?

"A  Well, I don't remember, Sir.

"Q  Well, that is why you would want him to put on the clothes from the night before?

"A  Well, probably for identification.

"Q  Identification and any other incriminating evidence that might be found on the pants or jacket?

"A  Sure.

"Q  Now, prior to telling him to put on the clothing that he was wearing at the time of the crime did anybody bother to tell him that that might be tending to incriminate himself?

"A  No, Sir.

"Q  Did anybody bother to tell him that he did not have to give evidence against himself, that he did not have to bring spotted or bloody pants, either?

"A  He was not advised of anything except his constitutional rights.

"Q  Except the constitutional rights of talking to officers about his crime?

"A  Right.

"Q  In other words, he didn't have to produce bloody trousers or bloody shirt?

"A  There was no mention to me of bloody trousers or bloody shirt.

"Q  Well, somebody told him that he did not have to put on the clothes he had on the night before?

"A  No.

"Q  Nobody told him?

"A  No, Sir.

"Q  Officer, did anybody tell you, give you any information prior to going to that apartment, of what Davis was wearing the night before?

"A  No.

"Q  You have no idea?

"A  There may have been Sir, but I was not aware of it.

"Q  You weren't aware of it?

"A  No.

"Q  And did anybody in the crew you were with, the four gentlemen who were with, have any indication of what Mr. Davis was wearing the night before?

"A  I don't recall.

"Q  And were the clothes that Mr. Davis eventually put on, were those clothes laying in a chair and on the bed, in that vicinity of the bedroom?

"A  Yes, I believe they were; I think they were laying on a bed or a chair.

"Q  In fact, there were other clothes, other pants laying in that general vicinity, too?

"A  I don't remember.

"Q  To the best of your recollection, Officer, wasn't there another suit coat hanging on the back of one of those chairs?

"A  I don't recall."

[Tr. of July 2, 1973, at 30–33.]

It was stipulated that all of the arresting officers would testify that Mr. Davis was not informed that he had a right not to give incriminating physical evidence:

"MR. HAUSMAN: Your, Honor, at this time the State and the Defense would enter into a stipulation that if Officer Borhart were called or Officer Enk was recalled to the stand that the testimony would be basically similar in respect that no officer at the time that Mr. Davis was allegedly told to put on the pants and clothes he was wearing the night before, advised him that he didn't have to bring forth physical evidence or incriminating evidence which would implicate him in the scene of a crime or help prove him guilty of any such crime.

"THE COURT: Is that correct?

"MR. MALMSTADT: That is correct."

[Tr. of July 2, 1973, at 37.]

Davis testified that he did not recall being told to put on the clothes that he had been wearing the night before, and instead that he was handed some clothes to put on by one of the officers. [Tr. of July 2, 1973, at 47.] The trial judge denied the motion to suppress without making a finding of fact with respect to the circumstances relating to Mr. Davis putting on the trousers:

> "It appears to the Court that what the defense is asking this Court today, at this particular time, is to make a finding of fact relative to the credibility of the conflicting testimony that has been presented to this Court, a determination of the credibility of the witnesses and the ultimate facts, that the status of this record is such that the Court would be exercising functions over and beyond its requirement. Accordingly, based upon all the records and arguments of counsel, Exhibits One, Two and Three that have been received into evidence, Defendant's Motion to Suppress the evidence, particularly as to a pair of trousers at this time, is overruled. Motion is denied."

> [Tr. of July 2, 1973, at 11.]

At trial, Officers Enk and Bottoni again testified that Davis had been told at the time of the arrest to put on the clothes he had been wearing the previous evening. [Trial Tr. at 76, 645.] Bottoni also testified that he did not recall seeing anyone with a gun drawn in Davis' bedroom. [Trial Tr. at 646–48.] Davis testified that two officers accompanied him into his bedroom, and that one asked him what color suit he had on the night before and Davis said "a blue suit," and that one of the officers then handed him a pair of blue trousers to put on. [Trial Tr. at 601.] Davis further testified:

"Q  Your testimony with respect to the events at the scene of the arrest was that after you were placed under arrest the police asked you what you were wearing, is that correct?

"A  The officers were saying different things at the same time. One of the two that was in the bedroom with me when he told me to get dressed, I started putting on a shirt, I believe, and one officer said 'what color suit did you have on,' he said 'what did you have on, what color clothes did you have on yesterday,' or something like that. And I said 'a blue suit.' I believe this is what was stated.

"Q  That's your recollection as to what was stated?

"A  I get a little bit confused as to specifically what was stated, but it was something to that effect, primarily because my faculties weren't really as clear, with officers with drawn pistols pointed at me. One officer particularly had a drawn pistol, and I was in a state of—a high state of nervousness, to say the least. So I really can't be exact. To the best of my memory, it was something like that."

[Trial Tr. at 625.]

Davis also introduced into evidence a different suit which he claimed he had been wearing at the time that the murder occurred. [Trial Tr. at 509, 592.]

In his memorandum decision of April 30, 1974, on the post-conviction motions, the trial judge held:

> "The defendant further moves the court, III:
>
> "SUPPRESSION OF EVIDENCE.
>
> "A. THE COURT ERRED IN ADMITTING PHYSICAL EVIDENCE SECURED IN VIOLATION OF THE DEFENDANT'S FIFTH AMENDMENT PRIVILEGE AGAINST SELF–INCRIMINATION.
>
> "This particular portion of the defendant's motion has to do with the clothing the defendant put on immediately after his arrest. This clothing was subsequently received into evidence. It had been tested and revealed blood stains of the type of the decedent, Allean Mosley, which was different than the blood type of the defendant.
>
> "A motion to suppress this evidence was heard before this court in July of 1973. The officers testifying at that time indicated that they either told or request-

ed the defendant to put on the same clothes he had on the previous night, namely, April 5th, 1972. The defendant, however, testified as follows at that particular hearing:

"'QUESTION: When you were told to get dressed did you retrieve the clothes or were they given to you?

"'ANSWER: I walked into the bedroom and immediately was handed clothing to put on.

"'QUESTION: And prior to be given those clothes was it inspected or shaken down in any way?

"'ANSWER: When Officer Enk gave me the clothes he grabbed some clothing and immediately began feeling it, I assumed, to see if there were any weapons or anything in those clothes.

"'QUESTION: And were you told at that time, Mr. Davis, or any time while you were in the bedroom, to put on the clothes you were wearing the night before?

"'ANSWER: Not that I recall.

"'QUESTION: At any time during getting dressed were you given free action as to your clothes, to pick out anything you wanted to wear?

"'ANSWER: No, I was not; I was handed the clothing that I was to put on. The only other thing, when I walked over to comb my hair another officer walked in the bedroom and said "pick up your stuff and—"'

"It would appear as though this particular portion of the defendant's post-conviction motions should be determined in the light of *State v. Tew*, 54 Wis.2d 361 [195 N.W.2d 615] (1972), and *State v. Driver*, 59 Wis.2d 35 [207 N.W.2d 850] (1973).

"In *State v. Driver*, the Wisconsin Supreme Court quotes from *Schmerber v. California*, 384 U.S. 757, 86 Sup.Ct. [S.Ct.] 1826 [16 L.Ed.2d 908] (1966), [86 S.Ct.] Page 764:

"'On the other hand, both federal and state courts have usually held that it (the fifth amendment) offers no protec-

tion against compulsion to submit to fingerprinting, photographing, or measurements, to write or speak for identification, to appear in court, to stand, to assume a stance, to walk, or to make a particular gesture. The distinction which has emerged, often expressed in different ways, is that the privilege is a bar against compelling "communications" or "testimony," but that compulsion which makes a suspect or accused the source of "real or physical evidence" does not violate it.'

"*State v. Tew* (supra), [54 Wis.2d] Page 363 [195 N.W.2d 615]:

"'. . . . the fifth amendment privilege extends only to oral testimonial activity, and not to fingerprinting, photographing or measuring the defendant. . . . . Similarly, the Wisconsin Constitution, Art. I, Sec. 8, provides "No person shall . . be compelled in any criminal case to be a witness against himself," and in *Barron v. Covey* (1955), 271 Wis. 10 [72 N.W.2d 387], . . ., this court held this provision related only to testimonial utterances and did not render inadmissible evidence the defendant in a drunken-driving prosecution refused to submit to the taking of a urine sample. This construction of Art. I, Sec. 8, was approved in *Waukesha v. Godfrey* (1969), 41 Wis.2d 401 [164 N.W.2d 314].'

"In view of the foregoing, it is this court's determination that the defendant's post-conviction motion IIIA be denied."

[Tr. at 21–23.]

On appeal, the Wisconsin Supreme Court did not consider the Fifth Amendment issue, although it was raised in appellant's brief, but instead considered petitioner's suppression motion only on Fourth Amendment grounds. *State v. Davis*, 66 Wis.2d 636, 656–57, 225 N.W.2d 505 (1975).

### DENIAL OF PETITIONER'S MOTION FOR A CONTINUANCE

▮ The petitioner asserts that he was denied due process of law and the effective

assistance of counsel in violation of his Sixth and Fourteenth Amendment rights by the trial court's refusal to grant a continuance following Robin Mosley's change in testimony. He contends that the defense was surprised by her change in testimony and that the proper remedy for surprise is a continuance. *United States v. Andrews*, 381 F.2d 377, 378 (2d Cir. 1967), cert. denied 390 U.S. 960, 88 S.Ct. 1058, 19 L.Ed.2d 1156 (1968); *Paschen v. United States*, 70 F.2d 491, 494 (7th Cir. 1934).

The Wisconsin Supreme Court declined to reverse petitioner's conviction on this ground, pointing out that a motion for continuance is addressed to the sound discretion of the trial court and holding that the trial court had not abused its discretion. 66 Wis.2d at 655, 225 N.W.2d 505. See also *Ungar v. Sarafite*, 376 U.S. 575, 589, 84 S.Ct. 841, 11 L.Ed.2d 921 (1969). This Court agrees. The trial court's error, if indeed there was one, was not of constitutional dimension.

A determination of whether the refusal to grant a continuance is so arbitrary as to violate the petitioner's constitutional rights depends upon the circumstances present in each individual case. *Ungar*, supra, at 589, 84 S.Ct. 841; *United States v. Jones*, 369 F.2d 217 (7th Cir. 1966). In this case, on the morning of September 12, 1973, at approximately 10:30 a. m., the prosecuting attorney informed both the court and opposing counsel that, whereas Robin Mosley had previously testified that she had *heard* petitioner's voice in her home on the night of her mother's murder, she was now claiming that she had also *seen* the petitioner, a fact which previously she had denied. [Trial Tr. at 231.]

Thereafter the child was examined by the court and both counsel out of the presence of the jury. [Trial Tr. at 242–260.] She did not testify in court again until the following day, at which time the defense established that she had previously consistently denied seeing the petitioner at her home on the night of the murder, and conducted a thorough cross-examination. [Trial Tr. at 385 et seq.] The case did not go to the jury

until the following day, September 14, in the afternoon.

Under these circumstances it is the Court's opinion that the trial court did not abuse its discretion in denying the motion for a continuance. The credibility of the child was already seriously in issue before the jury as a result of her change in testimony and the defense made good use of its opportunity to impeach her credibility during cross-examination on September 13. The defense also had two days between the time the change in her testimony was revealed to it and the time when it began closing arguments in which to investigate the cause for the change in her testimony. Furthermore, as grounds for its motion for a continuance the defense alleged surprise and a need to investigate whether Robin Mosley had been coached by any persons in preparing her testimony. The possibility of coaching is surely a consideration in any case of a witness who is a young child, and indeed the defense had tried to elicit information from Robin on that point during its previous cross-examination of her. It tried again to do so during the cross-examination on September 13, 1973.

As stated in *Ungar v. Sarafite*, supra, 376 U.S. at 589, 84 S.Ct. at 849:

> "* * * [I]t is not every denial of a request for more time that violates due process even if the party fails to offer evidence or is compelled to defend without counsel. * * * Contrariwise, a myopic insistence upon expeditiousness in the face of a justifiable request for delay can render the right to defend with counsel an empty formality. * * * There are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process. The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied. * * *."

For the reasons stated above, it is the Court's opinion that the trial court's denial of petitioner's motion for a continuance was not an abuse of discretion, and that the denial of that motion does not create an issue of constitutional dimension.

## FIFTH AMENDMENT CLAIM

The second issue which petitioner raises is whether the admission of his blood-stained pants into evidence at trial constituted a violation of his Fifth Amendment right against self-incrimination and, assuming that it did, whether their admission was an error so prejudicial as to require issuance of a writ of habeas corpus by this Court. The question presented is a substantial one, and one which has troubled the Court. After careful consideration, for the reasons set forth below, the Court has determined that a writ must issue.

As revealed in the facts set forth above, following his arrest at home on the morning following the murder of Allean Mosley, the petitioner was ordered by the arresting officers to put on the clothes which he had worn the previous night at the time the murder was committed. Petitioner claims not to have heard the order. Before trial in June 1973, and again by post-conviction motion, the petitioner moved to have the evidence of the blood-stained pants suppressed. It is apparent from the hearing held on the pretrial motion that petitioner's motion to suppress was based on two alternative theories: (1) that he had been unaware of the arresting officers' order to put on the clothes he had worn the night of the murder and therefore those clothes were not material evidence at trial since there was no competent evidence to show that petitioner had worn them at the time of the murder; and (2) that the order to put on the clothes he had worn at the time of the murder constituted a violation of petitioner's Fifth Amendment right against self-incrimination since it required him to give evidence of a testimonial nature against himself, and petitioner had not been warned prior to the giving of the order that he was not required to produce such evidence. [Tr. of June 6, 1973 at 3.] In the post-trial motions, both of petitioner's alternative theories for suppression were again presented to the trial court.

In neither case did the trial judge make an explicit finding resolving the factual dispute. By denying the motions, however, the court necessarily found that the testimony of the officers was to be believed, and that petitioner had heard and understood and complied with the order to put on the clothes which he had been wearing at the time of the murder. Otherwise, the trial court must necessarily have prohibited the state from introducing the pants as evidence at trial, since their materiality derived solely from the fact of the petitioner having admitted, through his act of putting on the pants in response to an order that he do so, that they were the pants he had worn at the time of the murder. Furthermore, in deciding the post-conviction motion to suppress, the trial court rested its decision squarely on the ground that no violation of the petitioner's Fifth Amendment rights had occurred because he had made no oral testimonial utterance in reference to the pants. As stated in *Townsend v. Sain*, 372 U.S. 293, 314, 83 S.Ct. 745, 758, 9 L.Ed.2d 770 (1963):

> "If the state court has decided the merits of the claim but has made no express findings, it may still be possible for the District Court to reconstruct the findings of the state trier of fact, either because his view of the facts is plain from his opinion or because of other indicia."

This Court is satisfied that the judge in the trial court resolved the factual dispute against the petitioner and admitted the pants into evidence on the implicit finding that they were indeed the pants petitioner had worn at the time of the murder.

The Court is also satisfied that the petitioner was in custody at the time he was ordered to put on the clothing which he had been wearing at the time of the murder. See *Orozco v. Texas*, 394 U.S. 324, 89 S.Ct. 1095, 22 L.Ed.2d 311 (1969). The officers testified at trial that they had gone to petitioner's apartment for the purpose of arresting him, that at least one of them had his gun drawn at the time of entering into the apartment, and that petitioner was given the following warning prior to being ordered to get dressed:

> "That he had a right to remain silent; that he had a right to have an Attorney

present; that anything that he said could be used against him in a Court of law; if he could not afford an Attorney one would be appointed for him at the earliest possible moment by the Court; he had a right to answer any questions he chose or not to answer any questions if he chose; if at any time during the questioning he wished to stop the interrogation he could do so; he was also asked if he understood those rights and he stated that he did."

[Tr. of July 2, 1973, at 30.]

Therefore, the only issue now presented for decision is whether petitioner was required to give evidence against himself in violation of his Fifth Amendment privilege against self-incrimination when, following his arrest, he was ordered to put on the clothing which he had worn at the time of the murder without having been warned specifically that he need not comply with such an order.

Judge Murphy ruled that the Fifth Amendment protects only against oral testimonial activity or communications, and does not protect against compulsion which makes a suspect the source of "real or physical evidence," citing *Schmerber v. California*, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966), and *State v. Tew*, 54 Wis.2d 361, 195 N.W.2d 615 (1972). He classified petitioner's action in putting on clothing with the type of action which a suspect engages in when he submits to fingerprinting, photographing, the taking of urine samples, etc., and which is not in violation of Fifth Amendment rights. In the opinion of this Court the classification made by the trial court was incorrect. While clothing per se is physical evidence and non-testimonial, see, e. g., *United States v. King*, 433 F.2d 937 (9th Cir. 1970), cert. denied 402 U.S. 976, 91 S.Ct. 1681, 29 L.Ed.2d 142; *McClard v. United States*, 386 F.2d 495 (8th Cir. 1967), motion denied, 399 F.2d 159 (8th Cir.), cert. denied, 393 U.S. 866, 89 S.Ct. 149, 21 L.Ed.2d 134, reh. denied, 393 U.S. 1045, 89 S.Ct. 638, 21 L.Ed.2d 598, the act of the petitioner in putting on certain clothing and thereby identifying it for the police was testimonial.

Chief Justice Traynor of the California Supreme Court in *People v. Ellis*, 65 Cal.2d 529, 55 Cal.Rptr. 385, 387, 421 P.2d 393, 395 (1966), explained the distinction between acts which are testimonial and those which are not as follows:

"In such a test [voice identification], the speaker is asked, not to communicate ideas or knowledge of facts, but to engage in the physiological processes necessary to produce a series of articulated sounds, the verbal meanings of which are unimportant. * * *."

"Voice identification testimony is the product of an observable physical characteristic made by an independent witness. It is the very type of objective factual evidence, independent of information communicated by the accused, that the privilege encourages police to seek. Moreover, independent identification testimony, unlike testimonial evidence derived from the accused, raises no question of reliance on the veracity of the accused. * * *."

See also *United States v. Dionisio*, 410 U.S. 1, 6, 93 S.Ct. 764, 35 L.Ed.2d 67 (1973); *Warden, Maryland Penitentiary v. Hayden*, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967); *United States v. White*, 322 U.S. 694, 64 S.Ct. 1248, 88 L.Ed. 1542 (1944); *United States v. DeMarsh*, 360 F.Supp. 132 (E.D.Wis.1973); *State v. Dennis*, 16 Wash. App. 417, 558 P.2d 297 (1976).

The United States Supreme Court has recognized that the protections of the Fifth Amendment are not limited to oral communications but also include privileges against performing acts which are merely a substitute for words:

"As the Court explained in *United States v. White*, supra, 322 U.S. at 698, 64 S.Ct. 1248, '[t]he constitutional privilege against self-incrimination . . . is designed to prevent the use of legal process to force from the lips of the accused individual the evidence necessary to convict him or to force him to produce and authenticate any personal documents or effects that might incriminate him.' "

*Bellis v. United States*, 417 U.S. 85, 88, 94 S.Ct. 2179, 2183, 40 L.Ed.2d 678 (1974).

"We have recognized that the Fifth Amendment 'respects a private inner sanctum of individual feeling and thought'—an inner sanctum which necessarily includes an individual's papers and effects to the extent that the privilege bars their compulsory production and authentication—and 'proscribes state intrusion to extract self-condemnation.'" Id. at 91, 94 S.Ct. at 2184.

In *Fisher v. United States*, 425 U.S. 391, 96 S.Ct. 1569, 48 L.Ed.2d 39 (1976), the Court held that neither the Fifth Amendment nor the attorney-client privilege prevented the Internal Revenue Service from securing documents prepared by the taxpayer's accountants from the taxpayer's attorney by way of summonses. However, the Court acknowledged that if the act of production required authentication of the documents by the taxpayer, a different result might follow, citing VIII *Wigmore on Evidence* § 2264 at 380. 425 U.S. at 412, ftn. 12, 96 S.Ct. 1569. In VIII *Wigmore on Evidence* § 2264 at 380 (McNaughton Rev. 1961) it is stated:

"* * * Testimonial acts of this sort—authenticating or vouching for pre-existing chattels—are not typical of the sort of disclosures which are caught in the main current of history and sentiments giving vitality to the privilege [against self-incrimination]. Yet they are within the borders of its protection."

Similarly in *Andresen v. Maryland*, 427 U.S. 463 at 473–74, 96 S.Ct. 2737, 2745, 49 L.Ed.2d 627 (1976), involving seizure of incriminating documents from the petitioner's office, the Court stated:

"This case thus falls within the principle stated by Mr. Justice Holmes: 'A party is privileged from producing the evidence but not from its production.' *Johnson v. United States*, 228 U.S. 457, 458, 33 S.Ct. 572, 57 L.Ed. 919 (1913). This principle recognizes that the protection afforded by the Self-Incrimination Clause of the Fifth Amendment 'adheres basically to the person, not to information

that may incriminate him.' *Couch v. United States*, 409 U.S., [322] at 328, 93 S.Ct. 611, [34 L.Ed.2d 548.] Thus, although the Fifth Amendment may protect an individual from complying with a subpoena for the production of his personal records in his possession because the very act of production may constitute a compulsory authentication of incriminating information, see *Fisher v. United States, supra,* a seizure of the same materials by law enforcement officers differs in a crucial respect—the individual against whom the search is directed is not required to aid in the discovery, production, or authentication of incriminating evidence."

The Court also noted specifically that the petitioner was not asked to say or do anything, nor to authenticate the records: "Any compulsion of petitioner to speak, other than the inherent psychological pressure to respond at trial to unfavorable evidence, was not present." 427 U.S. at 473, 96 S.Ct. at 2745. See also *In re January 1976 Grand Jury*, 534 F.2d 719 (7th Cir. 1976), wherein the majority of a panel of the United States Court of Appeals for the Seventh Circuit held that money stolen in a bank robbery is non-testimonial, and the delivery of the money by the defendant to his attorney is not assertive conduct, with the result that enforced production of the money by the defendant's attorney in accordance with a subpoena, or even enforced production by the defendant himself, would not violate the Fifth Amendment. The court also recognized, however, that the Fifth Amendment does protect against compulsory production and identification by an individual of his own effects where those effects would furnish a "'link in the chain of evidence'" leading to prosecution or conviction. 534 F.2d at 722.

While in this case the police could have seized petitioner's clothes during a search incident to a lawful arrest, such seizure would not have provided them with the testimonial information of whether the clothes were in fact those worn by the petitioner the previous night at the time that the murder occurred. Such informa-

tion could only have been provided by the petitioner himself, or some other person who had seen him at that time. The State presented no such "other person" at trial.

There is no difference between stating that one has worn certain clothes at a certain time, and admitting to the fact of having worn them by putting on the clothes in response to a direct order to do so. See *Null v. Wainwright*, 508 F.2d 340 (5th Cir. 1975), wherein the court held that defendant's statement that certain clothes were ones he had worn at a specified time in response to a police officer's request for the clothes, should be suppressed because the defendant was in custody and had not been given the proper *Miranda* warnings. Production of the clothing by Davis under the circumstances of this case is therefore unlike production of the money involved in *In re January 1976 Grand Jury*, supra, since that physical evidence, once produced, could be identified as stolen money by persons other than the defendant.

The question remaining, therefore, is whether the *Miranda* warnings which petitioner was given in this case were sufficient to apprise him of his right not to provide the police with the clothes which he had been wearing at the time the murder was committed.[2] Petitioner was informed of his right to remain silent but he was not informed specifically that he need not bring forth potentially incriminating physical evidence.

In *Maness v. Meyers*, 419 U.S. 449, 95 S.Ct. 584, 42 L.Ed.2d 574 (1975), the Court upheld the right of counsel to advise a client not to produce material which the lawyer believed would incriminate the client. In his majority opinion, Chief Justice Burger said:

" * * * The assertion of a testimonial privilege, as of many other rights, often depends upon legal advice from someone who is trained and skilled in the subject matter, and who may offer a more objective opinion. A layman may not be aware of the precise scope, the nuances, and boundaries of his Fifth Amendment privilege. * * * " 419 U.S. at 466, 95 S.Ct. at 595.

In all probability, no one would infer from a police warning that he had the right to remain silent, the further right to refuse to produce physical evidence in response to an order given by the police. Particularly is this so in a case such as this where petitioner, immediately after being informed of his right to remain silent, was ordered by police at gunpoint to dress himself in the clothing that he had worn last night.

The Fifth Amendment is designed to guard against incriminating evidence given under circumstances where a response is made because of the coerciveness of the circumstances rather than because of a freely given willingness to speak the truth. The Court now finds that the mandate of the Fifth Amendment has been violated in this case, not because the *Miranda* warnings given were faulty, but rather because, under the circumstances of this case, the defendant's waiver of his Fifth Amendment right against self-incrimination was unknowing, and therefore involuntary. Cf. *United States v. Ganter*, 436 F.2d 364 (7th Cir. 1970).

## HARMLESS ERROR

The correct standard to apply in a case where an error of constitutional dimension has been committed to determine whether a writ of habeas corpus must issue is set out in *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967), where the Court held:

" * * * [B]efore a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt."

2. Petitioner does not contest that he was given the standard *Miranda* warnings. See testimony of Officer Enk at the July 2, 1973 hearing.

See also *Martin v. Indiana*, 521 F.2d 682, 685 (7th Cir. 1975); *United States v. Cleveland*, 507 F.2d 731, 741 (7th Cir. 1974).

In this case the only piece of physical evidence which in any way implicates the petitioner in the murder of Allean Mosley was a small spot of blood found on the pants which petitioner put on at the order of a police officer during his arrest. Otherwise his conviction rests on the somewhat confused testimony of an eight year old child and a chain of circumstantial evidence none of which implicates petitioner directly in the murder.

Under these circumstances the Court cannot hold that the error committed by the trial court in refusing to suppress the physical evidence of the blood-stained pants, which were obtained from petitioner in violation of his Fifth Amendment rights, was harmless beyond a reasonable doubt. It is more than likely that the production of the pants had a substantial impact on the members of the jury and it may have influenced them in arriving at a guilty verdict. The Court cannot say that had the pants not been in evidence, the jury would nevertheless have reached the same verdict.[3] The remedy for such error is for this Court to vacate the conviction of petitioner and order that a new trial be held within a reasonable time, or that petitioner be released from custody. *United States v. Cleveland*, supra, at 741.

### ORDER

For the foregoing reasons,

IT IS ORDERED that the petition for a writ of habeas corpus is granted, unless a notice of appeal is filed with this court by the respondent within thirty days from the date of this order, in which case the issuance of a writ will be permanently stayed pending appeal, or unless the respondent notifies the petitioner and this court within sixty days of the date of this order of the State's intention to retry the petitioner, in which case the issuance of a writ will be permanently stayed provided such trial is actually commenced within ninety days after the service and filing of such notice with the clerk of this court.

---

3. The State has belatedly raised the claim in its reply brief that the voluntariness of petitioner's act in putting on the blood-stained pants is irrelevant, because in the afternoon of the day of his arrest, petitioner made a voluntary oral admission to the police that the clothes which he had put on that morning were the ones he had been wearing at the time of the murder. See transcript of June 6, 1973, hearing on pre-trial motions at 33. The state did not attempt to introduce petitioner's alleged oral admission at trial, and thus it has no relevance to the decision on this petition.