STATE of Maine

v.

Michael NASON.

Supreme Judicial Court of Maine.

Argued May 6, 1981.

Decided Aug. 13, 1981.

John R. Atwood, Dist. Atty., Patricia Goodridge Worth (orally), Asst. Dist. Atty., Rockland, for plaintiff.

Paine & Lynch, Martha J. Harris (orally), John D. Bunker, Bangor, for defendant.

Before McKUSICK, C. J., and WERNICK, GODFREY, ROBERTS and CARTER, JJ.

GODFREY, Justice.

Defendant Michael Nason appeals from a judgment of conviction for trafficking in prison contraband, 17–A M.R.S.A. § 757 (Supp.1980),[1] entered by the Superior Court after a jury trial. In a pretrial suppression hearing, the Superior Court denied Nason's motion to suppress certain scheduled drugs that a state police officer ordered Nason to remove from his rectal cavity upon arrival at the Maine State Prison. Nason challenges the constitutional propriety of that "search and seizure" and contends that the court erred in admitting the evidence thus obtained. Nason also challenges both the sufficiency of the evidence in support of his conviction under 17–A M.R.S.A. § 757 and

---

1. The section provides as follows:

    1. A person is guilty of trafficking in prison contraband if:

A. He intentionally conveys contraband to any person in official custody; or

B. Being a person in official custody, he intentionally makes, obtains or possesses contraband.

2. As used in this section, "official custody" has the same meaning as in section 755. As used in this section, "contraband" has the same meaning as in section 756.

3. Trafficking in prison contraband is a Class C crime.

certain jury instructions given by the trial court. We deny the appeal.

## I.

On August 30, 1979, Michael Nason was convicted of a drug offense by the Superior Court and sentenced to eleven months in the Maine State Prison. Execution of the sentence was stayed until October 31, 1979.

On October 31, 1979, Nason reported to the Penobscot County Jail in the late afternoon. Earlier that day, Nason had placed scheduled drug tablets in a plastic bag and inserted the package in his rectum. The next day, November 1, 1979, Nason was escorted to the Maine State Prison at Thomaston by two deputy sheriffs. Upon arrival, Nason entered the prison receiving room, where a prison classification officer and a state police officer were present. Prison admission procedures were initiated. After conversing generally with Nason, the state police officer formally identified himself, read Nason the *Miranda* warnings, told Nason he had reason to believe Nason had scheduled drugs on his person, and asked Nason to deliver those drugs. When the defendant hesitated, the state police officer served Nason with a warrant that purported to authorize a search of Nason's person, including his "body cavities," for scheduled drugs. He also allowed Nason to inspect an affidavit filed with the request for the warrant. While examining the warrant and affidavit, Nason expressed skepticism about the validity of the warrant, as well as the officer's authority to execute a search of body cavities. Nason then asked to speak to an attorney before consenting to the search. The police officer rejected the appellant's request. As he stood next to Nason, the officer responded in a calm but unyielding voice that Nason would fare better if he produced the drugs himself because the warrant would be executed one way or another. In the same tone of voice, the officer told Nason that if he refused to cooperate he would be taken to the prison hospital and forcibly searched by a medical team "even if it took five prison guards to hold him down."

Nason then agreed to cooperate. After a prison official spread newspapers on the floor of a corner of the windowless receiving room, Nason lowered his trousers and squatted over the newspapers with his back to the state police officer and another prison official. In this position, he expelled the package he had inserted the day before.

The police officer photographed the package on the newspapers, took possession of the package, and conducted an inventory of its contents, later identified as phencyclidine (PCP) and lysergic acid diethylamide (LSD). Both are scheduled drugs. 17–A M.R.S.A. § 1102(1)(J), (2)(H)(8) (Supp.1980).

In a two-count indictment, Nason was charged with trafficking in prison contraband, 17–A M.R.S.A. § 757. Nason's attorney moved to suppress the evidence obtained in the encounter described above on the ground that the warrant was insufficient and was executed illegally. In denying Nason's motion, the Superior Court concluded that the warrant was invalid but that the search and seizure were nevertheless reasonable under the Fourth Amendment as applied to the states through the Fourteenth.

A jury trial followed. Defense counsel objected to admission of the physical evidence, and the trial justice admitted the evidence over that objection. At the close of the evidence, defense counsel moved for a judgment of acquittal. On the evidence reviewed above, the jury found Nason guilty on both counts of the indictment.

## II.

Appellant first argues that several of his constitutional rights were violated in the encounter culminating in his excreting a package of scheduled drugs. He relies on evidence generated at the trial itself, presumably because the motion to suppress was heard and decided on written memoranda alone. *See State v. Albert*, Me., 426 A.2d 1370, 1373 (1981).

## A. The Reasonableness of the Search and Seizure

Appellant's principal argument is that the encounter was a search[2] and seizure, and that the search and seizure were unreasonable under the Fourth Amendment as applied to the states by the Fourteenth. *Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961). Nason argues that the "search" was unreasonable under the holding of the United States Supreme Court in *Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), and, as such, evidence seized as a result of that search should not have been admitted at trial. In response, the State argues that if the institutional interests of the prison are properly weighed against the privacy interests of Nason to be free from intrusive searches and if the manner in which the search in this case was conducted is considered, it is clear that the search was reasonable.

In *Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), the United States Supreme Court held that body cavity searches of prison inmates, conducted without probable cause, are not *per se* violative of the Fourth Amendment if conducted in a reasonable manner. The Court there recognized the wide variety of factors that should be considered in assessing the reasonableness of searches generally:

> The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application. In each case it requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted.

441 U.S. at 559, 99 S.Ct. at 1884. Specifically with respect to visual body cavity searches, the Supreme Court endorsed an analytical approach developed by the lower federal courts[3] when it balanced "the significant and legitimate security interests of the institution against the privacy interests of the inmates." *Id.* at 560, 99 S.Ct. at 1885. Thus, in determining whether there has been a violation of the Federal Constitution, this Court must weigh carefully the legitimate interests of Maine's penal institutions in assessing the reasonableness of the search and seizure in Nason's case. The presence of scheduled drugs in prison communities poses serious risks to the interests of those institutions in security, discipline and rehabilitation. Accordingly, while prison inmates are not without privacy rights protected under the Fourth Amendment as applied to the states through the Fourteenth, the scope of those rights, in relation to the restraints they place on state-administered searches and seizures, is narrower than that of persons not imprisoned for conviction of a crime. *Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). Nason contends that the search was unreasonable in several respects. The record discloses no evidence tending to show what prison policy toward cavity searches was when Nason was "searched." Nason thus argues that a person similarly situated would not reasonably expect a search of his rectal cavity upon admission to prison. Na-

---

2. What precisely constituted the "search" in this case is complicated by the fact that Nason produced the contraband that was ultimately seized before he was physically searched by prison medical personnel. In *United States v. Lilly*, 576 F.2d 1240, 1244 (5th Cir. 1978), the Court of Appeals began its analysis of this conceptual problem with the observation that "the legal validity of the seizure depends on the legal validity of the impending search." However, in evaluating the reasonableness of the "impending search," the court considered many factors other than how a physical search by prison medical personnel would have been conducted if the defendant had not finally agreed to remove the prison contraband herself. We follow the approach in *Lilly* by considering all circumstances surrounding the appellant's ultimate delivery of the evidence.

3. *E. g., United States v. York*, 578 F.2d 1036 (5th Cir. 1978), *cert. denied*, 439 U.S. 1005, 99 S.Ct. 619, 58 L.Ed.2d 682; *United States v. Lilly*, 576 F.2d 1240 (5th Cir. 1978), *pet. for rehearing denied*, 599 F.2d 619 (1979); *Daughtery v. Harris*, 476 F.2d 292 (10th Cir. 1973), *cert. denied*, 414 U.S. 872, 94 S.Ct. 112, 38 L.Ed.2d 91.

son also points to the police officer's admonition that the search would be performed even if it took five guards to hold him down, the officer's refusal to allow an attorney to be present, and the intrusiveness of rectal cavity searches in general as factors compelling the conclusion that the search was unreasonable.

■ The authorities had good reason to believe that Nason would attempt to smuggle scheduled drugs into prison. As the affidavit accompanying the search warrant plainly indicated, the state police and prison authorities were aware as a result of investigation that Nason planned to do so on November 1, 1979, in order to use and sell the drugs once inside. Also, the authorities were aware that Nason was being committed to prison because he had been convicted of a drug-related criminal offense. Those factors were sufficient to justify such a search on a person entering prison. *See Bell v. Wolfish, supra,* 441 U.S. at 558–60, 99 S.Ct. at 1881–85; *United States v. Lilly, supra,* at 1247; *Brown v. Hilton,* 492 F.Supp. 771, 777–78 (D.N.J.1980).[4]

■ Evidence of record also provides rational support for the conclusion that the confrontation was conducted reasonably. Nason was read his rights, abusive language was not used, he was given an opportunity to remove the package of drugs himself, and he was allowed to remove it in a windowless room in the presence of only two officers both of whom were of the same sex as he. Further, he was told that if he refused to cooperate, medical personnel would conduct the search at the prison hospital. Where, as in this case, prison authorities take such steps to conduct the search

in a reasonable manner, the absence of counsel does not "render the otherwise reasonable intrusion unreasonable." *United States v. Erwin,* 625 F.2d 838, 841 (9th Cir. 1980). Nason's Fourth Amendment rights were not violated by the search in this case. Under the circumstances, the conduct by the authorities administering the search was both justified and sufficiently deferential to the privacy interests of the appellant.

### B. Compelled Self-Incrimination

■ Nason also contends that his right to be free from compelled self-incrimination under the Maine[5] and United States Constitutions[6] was violated when he was forced to produce incriminating evidence, namely the package of scheduled drugs. We find no merit in this argument.

The United States Supreme Court has clearly held that the right to be free from compelled self-incrimination is not violated when the state obtains physical evidence through a compelled non-testimonial or non-communicative act of the defendant. *Schmerber v. California,* 384 U.S. 757, 761, 86 S.Ct. 1826, 1830, 16 L.Ed.2d 908 (1966). *Accord, State v. Buzynski,* Me., 330 A.2d 422, 425–26 (1974); *State v. Stevens,* Me., 252 A.2d 58, 60 (1969). Appellant attempts to distinguish *Schmerber* by characterizing the facts in the instant case as analogous to those in *Davis v. Israel,* 453 F.Supp. 1316 (E.D.Wis.1978), *aff'd without published opinion,* 601 F.2d 594 (7th Cir. 1979). In *Davis,* police officers ordered a suspect to select those clothes he was wearing on a day the officers knew to be the day the crime under investigation was committed

---

4. The holding of the Circuit Court of Appeals for the Fifth Circuit in *United States v. Lilly, supra,* squarely supports our conclusion here. Defendant Lilly, a prison inmate, left prison on a weekend furlough. While she was gone, several prisoners told prison officials that Lilly had bragged she smuggled marijuana into the prison after an earlier furlough. On the basis of that information, prison officials strip-searched Lilly when she returned. Having uncovered nothing from that search, a female medical officer searched Lilly's vagina in the presence of a female medical officer. The Court of Appeals held the search reasonable.

5. *Me.Const.,* art. I, § 6.

6. *U.S.Const.,* amend. V; *U.S.Const.* amend. XIV § 1. Because Article I, § 6 of the Maine Constitution and the fifth amendment to the federal constitution are so similar in nature and purpose, our construction of both provisions is guided by past judicial constructions of either provision. *Gendron v. Burnham,* 146 Me. 387, 82 A.2d 773 (1951).

and to put those clothes on. The suspect complied. The Court held that the clothing selected by the suspect should have been suppressed because the act of selection was both communicative and compelled.

In the case before us, however, unlike the *Davis* case, Nason's removal of the scheduled drugs was not communicative. Rather, it was an act facilitating a search for physical evidence, which the authorities would have been justified in conducting regardless of Nason's cooperation. The Superior Court did not err in admitting the package of scheduled drugs in evidence at trial.

## III.

On two grounds Nason contends that the Superior Court erred in denying his motion for a judgment of acquittal. He challenges the sufficiency of the evidence to support the findings of "official custody" and possession of "contraband," both of which are elements of trafficking in prison contraband under 17–A M.R.S.A. § 757.

### A. Official Custody

■ Both counts in the indictment charged Nason with "*being a person in official custody at the Maine State Prison,* having been committed to said prison on October 31, 1979 ....*"* Appellant contends that the evidence does not support the charge that he was "in official custody at the Maine State Prison" because the procedures for admission had not yet been completed when the contraband was discovered.

The statute under which appellant was charged, 17–A M.R.S.A. § 757 (Supp.1980), incorporates by reference the definition set forth in 17–A M.R.S.A. § 755(3) (Supp. 1980). The record provides rational support for a finding of official custody beyond a reasonable doubt under at least two clauses of this definition: (1) "custody in, or on the way to ... a jail ... house of correction, or any institution or facility under the control of the Bureau of Corrections" and (2) "any custody pursuant to court order." At the time state officials found contraband in Nason's possession, Nason had just arrived at the receiving room of the Maine State Prison. He was physically escorted there by at least one deputy sheriff from the Penobscot County jail, where Nason had reported the previous day. He was obliged to report on that date and was escorted by a sheriff because, by order of the Superior Court, execution of his sentence on a drug conviction was to begin on November 1, 1979. Even though procedures for formal admission to the Maine State Prison may not have been completed when the contraband was seized, Nason was in official custody *at* the prison as the indictment alleged. *See State v. Jackson*, Me., 394 A.2d 769 (1978); *State v. Morton*, Me., 293 A.2d 775, 778 (1972).

### B. Possession of Contraband

■ Nason argues that he should have been acquitted because the definition of contraband, incorporated by reference pursuant to 17–A M.R.S.A. § 757, should not be read to include scheduled drugs like those in his possession at the time of his search. He contends that to read the definition of contraband as including scheduled drugs, the possession of which is independently criminal under 17–A M.R.S.A. § 1107, is contrary to legislative intent. *State v. Bishop*, Me., 392 A.2d 20 (1978), is clear authority to the contrary, and we see no reason to overrule that decision. *See also State v. Bonney*, Me., 427 A.2d 467 (1981). The special problems inherent in supervising prison communities provide rational justification for the legislative determination that possession of scheduled drugs by prison inmates is a separate criminal offense.

## IV.

Appellant argues that several jury instructions given by the trial court were erroneous and prejudicial. We find none of appellant's arguments persuasive.

■ First, Nason contends that the Superior Court's instruction on the element of official custody was erroneous because it permitted the jury to believe they could find the appellant in official custody "if he

was being transported to the prison or in the custody of an official." The court instructed the jury as follows:

So with that introduction, let's look at the essential elements of this offense. In order for you to return a verdict of guilty, you would have to be satisfied beyond a reasonable doubt of the following matters: first of all, that this Defendant was a person who was in official custody, and as used in this provision, official custody means arrest, custody in or on the way to or from a jail, police station, house of correction, or any institution or facility under the control of the Bureau of Corrections.

Now the allegation is that he was within the custody of the Maine State Prison at Thomaston, and it is for you to determine as a matter of fact whether he indeed was within the official custody of the Maine State Prison.

Although the instruction describes the charge too narrowly by suggesting that the Maine State Prison, in contrast to some other state agency authorized to arrest or restrain a person, must have had custody of the appellant, it is otherwise adequate. The court's reference to "custody in or on the way to a jail" was an accurate synopsis of the statutory definition of official custody and quite appropriate in view of the fact that, technically speaking, Nason may not yet have been formally admitted to the

Maine State Prison. The instruction posed no risk of jury confusion or error.

Second, Nason appears to be claiming that the trial court erred when, in instructing the jury, it concluded as a matter of law that PCP and LSD were controlled substances under Maine law and therefore contraband for purposes of 17–A M.R.S.A. § 757.[7] The court's conclusion, appellant argues, removed an element of the crime from the jury's consideration and was prejudicial because the State did not introduce into evidence the statute prohibiting possession of PCP and LSD, 17–A M.R.S.A. § 1107.[8]

Section 756(2), to which section 757 requires reference for the statutory definition of contraband, includes within the definition of contraband any thing the possession of which is prohibited by statute.[9] If Nason is arguing that the jury should have decided whether PCP and LSD were controlled substances as prescribed in 17–A M.R.S.A. § 1102, he is wrong. Whether certain substances are classified as scheduled drugs and therefore subject to the provisions of 17–A M.R.S.A. § 1107 is a question of law properly decided by the trial judge.

On the other hand, if Nason is arguing that the jury should have determined whether, under § 1107, Nason pos-

7. The trial justice instructed the jury as follows:

The next element is whether or not he possessed contraband. Well, first, let's start out with the definition of what contraband is, and then consider whether he possessed it. Contraband is defined under this provision of the law as being anything which a person confined in official custody is prohibited by statute from possessing, and that's a fairly long and complex definition, but I will instruct you as a matter of law that the statutes of Maine prohibit the possession of Phencyclidine, and Lysergic Acid Diethylamide, commonly referred to as PCP and LSD. Aa a matter of fact, it is not only in official custody, but there is a general statute that prohibits the possession of those, so you must then determine whether or not this Defendant possessed Phencyclidine or possessed LSD.

Now possessed means to have within your physical custody and control, to exert dominion over physically, and it is for you to determine as a matter of fact whether this Defendant had PCP or LSD, and if so, did he have it within his physical custody and control.

8. Section 1107 provides in pertinent part:

A person is guilty of unlawful possession of a scheduled drug if he intentionally or knowingly possesses a useable amount of what he knows or believes to be a scheduled drug, and which is, in fact, a scheduled drug . . . .

9. Section 756(2) provides:

As used in this section, "contraband" means a dangerous weapon, any tool or other thing that may be used to facilitate a violation of section 755, or any other thing which a person confined in official custody is prohibited by statute or regulation from making or possessing.

sessed a *usable* amount of PCP and LSD, we agree that the trial justice would have erred if he had concluded as a matter of law that a usable amount of PCP and LSD was in Nason's possession. Contraband, as an element of the offense set forth in section 757 and as defined in section 756, requires that possession of the thing be prohibited by statute. Because possession of scheduled drugs under section 1107 is prohibited only if the amount of the scheduled drugs is a "useable amount," the element of contraband requires proof beyond a reasonable doubt that the defendant possessed a usable amount of the scheduled drug. Accordingly, Nason was entitled to a specific instruction on whether the PCP and LSD in his possession were usable quantities. *See State v. Glynn*, Me., 432 A.2d 799 (1981); *State v. Bonney*, Me., 427 A.2d 467 (1981).

Defense counsel never requested the instruction, however, and the record indicates the presiding justice regarded the issue of possession as a question of fact to be decided by the jury. *See* note 7 *supra*. More important, evidence showing the scheduled drugs in Nason's possession to have been a usable amount was overwhelming and uncontroverted. Accordingly, the absence of a specific instruction on "useable amount" did not harm the appellant in this case. *State v. Rich*, Me., 395 A.2d 1123 (1978); *State v. McKeough*, Me., 300 A.2d 755 (1973); M.R.Crim.P. 52(a).

Third, Nason contends that the court erred in instructing the jury on his alleged state of intoxication and abnormal condition of mind at the time of the offense. Defense counsel requested instructions on both intoxication and mental abnormality on the theory that they were relevant to whether Nason had the requisite intent to possess the contraband. Adequate instructions were given. Although Nason argues that the effect of those instructions was to disparage his defense, we have reviewed the Superior Court's instructions and discern no such disparagement. *Cf. State v. Caron*, Me., 382 A.2d 1390 (1978) (skeptical comments on the evidence during charge to the jury).

None of the other issues raised by appellant requires the attention of this Court.

The entry is:

Appeal denied.

Judgment of conviction affirmed.

All concurring.