STATE of Maine

v.

James M. ALBERT.

Supreme Judicial Court of Maine.

Argued Nov. 18, 1980.

Decided March 16, 1981.

Michael E. Povich, Dist. Atty., Bronson Platner (orally), Asst. Dist. Atty., Ellsworth, for plaintiff.

Paine & Lynch, Martha J. Harris (orally), Bangor, for defendant.

Before McKUSICK, C. J., and WERNICK, GODFREY, NICHOLS, GLASSMAN, ROBERTS and CARTER, JJ.

GODFREY, Justice.

Defendant James M. Albert appeals from a conviction for burglary of a dwelling place, a Class B offense, in violation of 17–A M.R.S.A. § 401 (1980).[1] He challenges the conviction on several grounds, among them that certain evidence used against him at trial was obtained through an illegal

search and seizure, and that the evidence presented at trial was insufficient to show that the structure he was charged with burglarizing was a "dwelling place." We affirm the judgment below.

In the evening of January 24, 1978, a burglary was committed at a summer cottage in Northeast Harbor. The owner, a resident of Washington, D. C., had left the cottage in September of 1977 and did not expect to return until June of 1978. At the time of the burglary the cottage was unoccupied. The furniture was piled up and covered by cloths, and the utilities were disconnected. Among the items removed from the cottage were a Chippendale side table and a small travel clock.

At about 7:20 p. m. on that evening, Chief of Police Murphy, of Mount Desert, had stopped a blue and white Ford automobile for displaying an inverted rear license plate. At the wheel was a man with a short beard who produced a driver's license belonging to James Albert. Two other males were passengers in the vehicle. When Murphy asked for the registration of the vehicle, the driver produced a registration certificate showing that Sharon Ginn of Brewer was the record owner. After the driver corrected the mounting of the license plate, Murphy allowed him to leave, and the car departed in the direction of Northeast Harbor.

Soon thereafter Clayton Wallace, a resident of Northeast Harbor, was driving past the cottage in question when he noticed a blue and white automobile parked in front. One individual was in the driver's seat and two others were just entering the car.

After Wallace drove past the cottage, Frederick Brown, also a resident of Northeast Harbor, came upon the scene from the opposite direction. As he approached the cottage, Brown saw a blue and white automobile parked near the cottage. He saw

---

1. Section 401 provides, in pertinent part:

    1. A person is guilty of burglary if he enters or surreptitiously remains in a structure, knowing that he is not licensed or privileged to do so, with the intent to commit a crime therein.

2. Burglary is classified as:

    .    .    .    .

    B. A Class B crime ... if the violation was against a structure which is a dwelling place;
    C. All other burglary is a Class C crime.

two or three persons enter the car and close the door. Brown saw the vehicle start on its way and then observed an object in the road where the vehicle had been. Stopping to examine the object, Brown found that it was a small travel clock. He took the clock to the Mount Desert Police Department, showed it to Chief Murphy, and related what he had seen.

Reserve police officer Joseph Birch, who had been present at the police department, drove to the cottage to investigate. Birch found a drawer and a table leg lying by the side of the road a short distance from the cottage. In the meantime Chief Murphy had arrived at the cottage and had discovered footprints in the snow leading to a broken window on the east side of the structure. After Birch rejoined Murphy and showed him the drawer and table leg, the two made a further search along the roadside and found several more fragments of furniture.

The discovery of so many pieces of debris caused Chief Murphy to believe that the car seen parked in front of the cottage might contain additional furniture fragments. Because of the proximity in time, the similarity in coloring, and the fact that three men were riding in the car, he concluded that it was the same car he had stopped earlier in Mount Desert to have the license plate corrected. Accordingly, he issued an all-points bulletin for the vehicle. Despite sustained efforts to find the automobile, the police did not find it until February 21, 1978, when it was seen at Sharon Ginn's residence in Brewer, Maine. On that day, Murphy obtained a search warrant based on an affidavit recounting the events described above. The warrant purported to authorize a search only for furniture fragments.

The officers served Sharon Ginn with the search warrant and towed the vehicle to the Brewer police station. Underneath the back seat of the vehicle the police found a number of small wood chips. They also seized a pair of gloves and some small pieces of broken glass. A forensic chemist later determined that some of the wood

chips came from the broken furniture found near the cottage. Furthermore, the chemist concluded that the broken glass certainly came from the same "batch" of glass as did the broken window in the cottage. However, the chemist admitted that a single "batch" of glass weighs several tons and can supply material for many windows.

Sharon Ginn, who owned the searched vehicle, worked a shift from midnight until seven o'clock in the morning. Since she did not need her car during the day, she let her friends use the car freely. She always left the keys in the car, and no one had to ask her specifically for permission provided they brought the car back in time for her to go to work. Although Albert was one of Ginn's friends and thus would have been allowed to use the vehicle if he had asked, he had never actually requested permission to borrow the automobile.

The main strategy of the defense at trial was to try to prove that Chief Murphy misidentified Albert as the driver of Ginn's car on the night of the burglary. Without taking the stand, Albert sought to prove by hearsay testimony of another person that he had lost his operator's license and had been issued a duplicate, in order to present to the jury the possibility that the operator of Ginn's car on the night of the burglary had been not Albert but someone else who had come into possession of Albert's original license. Albert's effort to prove the loss of his license by the testimony of another person was frustrated by the trial court's application of the hearsay rule to exclude the evidence when the state's attorney objected.

Albert did not take the stand because he had prior convictions for crime and the state's attorney announced his intention to use one or more of those convictions to impeach him if he testified. At a *Toppi*-type conference of the trial justice and the attorneys, the justice ruled that he would permit such impeachment.[2]

## I.

Soon after he was indicted, Albert moved in Superior Court to suppress the fragments

2. See State v. Toppi, Me., 275 A.2d 805, 813 (1971).

of wood and glass and other evidence that had been seized pursuant to the search warrant. He asserted that the warrant was insufficient, had been illegally executed, did not describe some of the property seized, and was issued without probable cause. According to the docket entries, a hearing was held on the motion to suppress and the parties submitted to the court written memoranda of law. The presiding justice denied the motion to suppress, stating no reasons for his decision. The record on appeal contains no transcript of the suppression hearing. During trial, Albert renewed unsuccessfully his motion to exclude evidence developed from search and seizure of the Ginn automobile. Giving no reasons, the trial justice ruled against exclusion. On appeal, appellant relies on evidence adduced at the trial itself as the basis for his Fourth Amendment claim.

■ Careful examination of the entire record does not reveal any possible basis on which Albert could have standing to assert a claim that his own Fourth Amendment rights were violated by the police search of Ginn's automobile more than three weeks after the burglary. The evidence connecting him with Ginn's car consisted of Chief Murphy's testimony directly identifying Albert as the driver on the evening of the burglary, and the testimony of Sharon Ginn who said that Albert was a friend of hers and that she let all her friends borrow her car whenever they wanted to do so provided they returned it in time for her own needs. The theory of the defense was that Albert was not even driving Ginn's car at the time of the burglary. If the state's contention, believed by the jury, that Albert was driving the car at the time of the burglary is accepted for purposes of analyzing his Fourth Amendment standing, it is apparent that whatever "legitimate expectation of privacy" he may conceivably have had with respect to the car and its contents had

ceased before the police searched it more than three weeks later.[3] Albert asserted no proprietary or possessory interest in the items seized, and there is no evidence that he exercised any control over the car with Ginn's permission, tacit or otherwise, after the night of the burglary. It follows that he had no standing, in the circumstances, to assert Fourth Amendment rights with respect to the evidence seized in Ginn's automobile. *Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978). *See United States v. Vicknair*, 610 F.2d 372 (5th Cir. 1980) (appeal pending); *Pollard v. State*, 388 N.E.2d 496 (Ind.1979); *State v. Johnson*, 598 S.W.2d 123 (Mo.1980).

## II.

The evidence presented at trial tended to show that the structure Albert was accused of burglarizing was a summer cottage. The burglary occurred in the dead of winter, at a time when the utilities were disconnected from the cottage and the furniture was piled up and covered in the middle of the rooms. No one was present at the cottage when it was burglarized; the owner had left Maine in September and did not expect to return to the cottage until June. She had arranged for a caretaker to watch the cottage.

The Maine Criminal Code distinguishes between types of structures in classifying burglaries for the purpose of determining penalties. 17–A M.R.S.A. § 401 (1980). Simple burglary is a Class C crime. When the burglarized structure is a dwelling place, however, the offense is elevated to Class B. Subsection 2(B) of section 401. "Dwelling place" is defined elsewhere in the code as "a structure which is adapted for overnight accommodation of persons . . . ."; expressly excluded are "structures formerly used as dwelling places which are uninhabitable." 17-A M.R.S.A. § 2(10) (1980).[4] It

---

**3.** It is not necessary to decide whether he originally had any such legitimate expectation of privacy in the circumstances, and we intimate no opinion on that question.

**4.** Section 2(10) provides as follows:

"Dwelling place" means a structure which is adapted for overnight accommodation of persons, or sections of any structure similarly adapted. A dwelling place does not include garages or other structures, whether adjacent or attached to the dwelling place,

is immaterial whether a person is actually present. *Id.*

On appeal, Albert contends that there was insufficient evidence to support his conviction for burglary, Class B, because the trial testimony unequivocally showed that the summer cottage was not, at the time of the burglary, within the code definition of a "dwelling place." While conceding that the cottage was adapted to overnight accommodation of persons, Albert argues that in mid-winter it fell within the exclusion because it was then only "formerly used" as a dwelling place and was uninhabitable. The statutory exclusión is not to be read so broadly.

Coupled with the careful definition of "dwelling place," the provision for enhanced penalty in section 401(2)(B) expresses a legislative decision that burglary of a dwelling, even when the burglar is unarmed and non-violent, is more serious than burglary of other types of structures. That decision reflects the sense of outrage with which hostile intrusions into the home have been regarded for centuries in English and American law.[5]

For classification as a "dwelling place," it suffices that a structure be adapted for overnight accommodation of persons; it is immaterial whether any person actually be present in the structure at the time of the burglary. It is clear from the definition that the temporary absence of occupants does not necessarily change the character of a dwelling place; only when it has become uninhabitable and is no longer used as a dwelling place does it lose its special status.

The exclusion of "structures formerly used as dwelling places which are uninhabitable" does not serve to remove a temporarily vacated summer cottage from the definition of "dwelling place." Appellant argues that the cottage could not be used during the winter months for lack of heat and other utilities and was therefore "unin-

habitable" within the meaning of the statute. That argument ignores the import of the word "formerly" in the statutory exclusion of "structures formerly used as dwelling places which are uninhabitable." In context, the implication of "formerly" is that the exclusion is limited to structures which were once used as dwelling places but, being now uninhabitable, will not be so used again.

In brief, the meaning of the exclusion is that, for practical purposes, the use of the structure as a dwelling place must have ceased permanently because it has become uninhabitable. The exclusion was aimed at structures that were once dwelling places but have been abandoned by their owners and allowed to deteriorate to the point that they can no longer be used as places of human habitation.

The trial court left to the jury the characterization of the burglarized cottage. On the evidence, the jury could rationally have found beyond a reasonable doubt that, although unoccupied for the winter, the cottage was still a structure adapted for overnight accommodation of persons and still inhabitable. The evidence thus sufficed to support the jury's conclusion that it remained a "dwelling place" within the meaning of 17 ·A M.R.S.A. §§ 2(10) and 401. *See State v. Theriault*, Me., 425 A.2d 986 (1981); *State v. Flick*, Me., 425 A.2d 167 (1981).

No other issues require the attention of this Court.

The entry is:

Appeal denied.

Judgment affirmed.

All concurring.

---

which are used solely for the storage of property or structures formerly used as dwelling places which are uninhabitable. It is immaterial whether a person is actually present.

**5.** *See* A.L.I., 2 Model Penal Code Part II, §§ 221.0, 221.1, at 67 (1980).